**Ralph GREENSLADE, Plaintiff–Appellant,**

v.

**CHICAGO SUN–TIMES, INC., and Chicago Newspaper Guild, Local 71, Defendants–Appellees.**

No. 96–2705.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1997.

Decided April 29, 1997.

Rehearing Denied May 29, 1997.

Robert J. Trizna (argued), Michael D. Lee, Schuyler, Roche & Zwirner, Chicago, IL, for Plaintiff-Appellant.

S. Richard Pincus, Michael L. Sullivan (argued), Fox & Grove, Chicago, IL, for Defendant-Appellee.

Kenneth E. Edwards (argued), Chicago Newspaper Guild, Chicago, IL, for Defendant-Appellee.

Before MANION, KANNE, and EVANS, Circuit Judges.

MANION, Circuit Judge.

Ralph Greenslade was an experienced editor of the sports section of a major newspaper. He befriended a new female coworker as they worked together on the night shift. He offered her rides home and gave her workplace and personal advice, usually unsolicited. Soon she grew tired of his imposing attention and began to refuse to ride home with him unless someone else rode along. She also avoided face-to-face contact with him. This bothered him, and he brought the situation to the attention of the newspaper's management. She followed with her side of the story. The paper's management concluded he had not sexually harassed her, but transferred him anyway to a job he was scheduled to take within a year. He sued the newspaper under Title VII claiming sex discrimination, and made the same charge against his union which had decided not to pursue a grievance. He also sued the newspaper and the union for breach of the collective bargaining agreement between them, alleging his contract rights were violated and the union violated its duty of fair representation by not pursuing his grievance.

The magistrate judge concluded there was no sex discrimination nor a breach of contract, and granted summary judgment to the newspaper and the union. We affirm.

## I.

We begin by describing our examination of the record. Because the magistrate judge disposed of this case on summary judgment, we consider this appeal under the familiar Rule 56 standard applied in the district court. We examine the detailed facts *de novo*, and view them in the light most favorable to the non-movant. *Sample v. Aldi,*

*Inc.,* 61 F.3d 544, 546 (7th Cir.1995). The court is not required to "draw every *conceivable* inference [in the non-movant's favor], but only those that are reasonable." *Bartman v. Allis–Chalmers Corp.,* 799 F.2d 311, 312–13 (7th Cir.1986), *cert. denied,* 479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987). "Summary judgment is proper only if there is no genuine (in the sense of reasonably contestable) issue of material (that is, potentially outcome-determinative) fact. Fed. R.Civ.P. 56(c)." *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1396 (7th Cir.1997).

## A. Factual Background [1]

When he sued, Ralph Greenslade was a sports news editor at the Chicago Sun–Times. He was 41 years old·and married. He worked at the sports copy desk with several others, including Laura Wagner, a recently hired copy editor. Greenslade began work there in 1980. Wagner, who was 24 years old and also married, started in the fall of 1994, and was the first woman hired to work in her position. As sports news editor, Greenslade and others were responsible for designing and laying out the SunTimes' sports page. Greenslade and Wagner worked the 5 p.m. to 1 a.m. shift together three times per week.

The "sports copy desk" is actually a number of desks pushed together in the newspaper's sports department. Greenslade and Wagner worked in close quarters, sometimes within 5 feet of each other. Notwithstanding this close physical proximity, editors at the sports desk frequently communicate with their coworkers about business and personal matters via an electronic mail (e-mail) system. Greenslade created an inventory of multi-colored "form" e-mail messages for business and personal reasons which could be sent quickly to one or more coworkers. Included among his "form e-mails" was one in which Greenslade offered rides home to coworkers who lived within a few miles of the SunTimes building and who had not driven to work themselves.

Shortly after Wagner began work at the paper, Greenslade began offering her rides home.[2] She accepted some of these offers. Greenslade and Wagner also had some contact with each other when coworkers went out as a group after work. At some point during the fall of 1994, the quantity and content of e-mail messages Greenslade sent Wagner began to concern her. She was receiving more personal e-mails from Greenslade than from anyone else at the newspaper.

On November 6, 1994, Greenslade asked Wagner whether she had had any television experience while at the University of Missouri. Greenslade later testified that nothing in Wagner's reaction to this question led him to believe she had felt harassed by it. Still, Greenslade decided he needed to discuss the comment with Wagner or at least clarify what he meant by the comment. When Greenslade next worked with Wagner, he asked her to go to the cafeteria to privately ask her whether the comment had bothered her. She assured him she did not consider the comment inappropriate. That same day, Greenslade overheard Wagner discussing a "wild evening" she had had the previous night and morning while out with coworkers after work. She said her husband had·been worried and drove around looking for her. Greenslade took this occasion to tell Wagner that when he was newly married, his wife once stayed out later than he had expected, and he had considered calling the police.

**1.** Fed. R.App. P. 28(a)(4) requires a statement of facts "relevant to the issues presented for review." Circuit Rule 28(d)(1) requires that "[t]he statement of the facts relevant to the issues presented for review ... shall be a fair summary...." Greenslade's briefs ignore large portions of the record which the magistrate judge directly relied upon to reach his decision. Because the judgment of the district court and of this court turns on many uncontroverted facts, it is necessary to recite those facts here in some detail. Leaving out pertinent information can cause an unfair summary of the facts. *See, e.g.,* *Avitia v. Metropolitan Club of Chicago,* 49 F.3d 1219, 1224 (7th Cir.1995). Even though when reviewing summary judgments we view the facts in the light most favorable to the non-movant, the non-movant cannot simply leave out uncontested relevant facts.

**2.** The record is not clear whether these early e-mails from Greenslade to Wagner were a "form" offer or personalized. Later, many of the e-mails he sent her, including ride offers, were personalized.

Greenslade admits he "probably butted in" by telling this story, "putting in [his] two cents when it wasn't solicited." After November 6, for the first time, Wagner began refusing rides from Greenslade unless someone else was riding along.

Greenslade continually expressed concern over Wagner's safety. Greenslade recalls e-mailing Wagner that he would not want his wife or daughter leaving a job downtown late in the evening and taking a cab home. When Wagner received this message, she found it inappropriate because she was not his daughter or his wife. Greenslade admits he was overprotective of Wagner; she concurred, believing that he had an "unnatural sense of protectiveness" toward her. At least a few times Wagner's coworkers commented to her about Greenslade's overprotectiveness and attention toward her. Once, when the threat of a strike hung over the paper, Greenslade called only two people at home—his wife and Wagner—to tell them that there would not be a strike. Wagner found it peculiar that Greenslade would call her at home because she was scheduled to work that day and would hear the news at the office that afternoon.

In early to mid-November 1994, Wagner began keeping a diary of Greenslade's e-mail messages to her, as well as her thoughts about the developing situation. In one of these notations, Wagner wrote that she felt uncomfortable around Greenslade because of his overprotectiveness and that she would avoid any one-on-one situations with him. On November 18, Greenslade e-mailed Wagner to ask her to talk to him alone for five minutes. She felt uncomfortable doing so, and did not respond. One night in late November, Greenslade was planning to take coworkers Bob Mazzoni and Wagner home after work. Mazzoni had to stay late at work that night, and at the last minute he alerted Greenslade that he would not need a ride. When Wagner heard this, she said she would take a cab and quickly left the room. Greenslade felt like Wagner was "portraying [him] as ... some type of a pervert" for refusing to ride alone with him; he was upset and humiliated after this occurred. The next time Wagner accepted a ride with Greenslade and

Mazzoni, Greenslade emailed her a message that stated: "Super! You made my night, believe me...." Wagner refused Greenslade's ride offers on November 25th, 28th, and December 3rd.

Greenslade spoke to at least four of their coworkers concerning the situation with Wagner. Greenslade said it appeared to him that Wagner was trying to distance herself from him. The situation became a topic of discussion among some of the staffers, although Wagner preferred that it not be. Greenslade never saw any evidence that talk about the situation with Wagner ever disrupted the department's ability to perform its duties.

On December 5, 1994, Greenslade sent another email to Wagner that said: "I know I'm getting to be a pain [in] the butt with these ride offers. I apologize. But, I can't help myself. If you'd like to save the cab fare, I'd be happy to drive you home." Wagner's response: "I appreciate the offer, but it's OK. I don't mind cabbing. Thanks though." The next day, Greenslade again e-mailed Wagner with a ride offer that said: "I sense I'm making you uncomfortable with my offers of a ride every night." The message went on to set forth an elaborate protocol for when and how Greenslade would ask Wagner whether she wanted a ride each night. Wagner's response: "I've said before that it's not that big a deal. There is no reason for you to feel obligated to offer, not offer, drive, not drive. Whatever. It's really not a big deal." Greenslade said he continued to offer Wagner rides because she never told him or clearly indicated to him that she did not want any more ride offers.

On December 6 or 7, 1994, Wagner returned a book Greenslade had lent to her to his mailbox. Greenslade became very upset that she did not return it to him in person. Because of this incident, Greenslade slept only one hour that night. Wagner became aware that Greenslade was communicating with coworkers about the situation because an e-mail Greenslade drafted to another coworker about Wagner was mistakenly sent to her.

During the morning of December 8, 1994, while still at home, Greenslade telephoned

their joint supervisor, Rick Jaffe, at work to discuss the "building problem" with Wagner. Up until this time, Jaffe was unaware of any tension between Greenslade and Wagner. In that telephone conversation and at a meeting the same day, Greenslade related to Jaffe how Wagner had returned his book in an impersonal manner, had quickly rejected a ride the night Mazzoni had to stay, and other incidents between them in which he perceived her to be distancing herself from him. Jaffe testified that Greenslade said he felt "mentally tortured, that he had befriended Laura; and, that it was making it difficult for him to do his job because of—he perceived it to be a misunderstanding on her part. And it was—he couldn't sleep at night. He was having trouble eating. I think he said something like he was having brain cramps about it." Jaffe's notes from that meeting reflect that Greenslade thought Wagner "was playing mind games with him," and that Greenslade considered himself oldfashioned, that his kindness was being misinterpreted, and that she was not accepting his apologies. As a result of these conversations, Jaffe and Greenslade agreed that Greenslade would stop e-mailing Wagner, except as needed for work, and that he would stop offering her rides home. Greenslade rejected Jaffe's suggestion to call Wagner into the meeting to clear things up, he says because Wagner had only been on the job for a few months and he was concerned that being called in for such a discussion would upset her. Afterwards, Greenslade e-mailed Jaffe that "they already had a nice spot reserved for me at the Elgin State Mental Hospital." He later said this was an attempt at humor. Greenslade told some of his coworkers about the meeting with Jaffe.

The next day Greenslade worked, December 11th, he experienced a great deal of anxiety from no longer communicating with Wagner on a personal level, sending her e-mails, or offering her rides home. Greenslade sent Jaffe an e-mail which expressed interest in obtaining psychiatric help or counseling regarding the situation with Wagner. Greenslade continued to communicate with her as necessary on work-related topics. Greenslade said it was difficult to keep his promise to Jaffe because it was awkward to sit 5 feet from Wagner and give her the "cold shoulder" while everybody else joked around. This anxiety in part caused Greenslade to leave the newspaper around midnight, an hour before his shift ended, and go to a local tavern. Later on, several coworkers, including Wagner, joined Greenslade there. Wagner and Greenslade talked for about 45 minutes about some of the things that bothered her at work, including that the flashing "message pending" light on her terminal bothered her when she received numerous e-mails. They discussed her rejection of his ride offers, and Greenslade apologized for being overprotective of her. Greenslade thought that the "silent treatment" idea was bad because it upset him. During this conversation, Greenslade told Wagner that he had gone to Jaffe to discuss the situation. Greenslade said later he thought this discussion with Wagner "cleared the air."

Because Greenslade had gone to management about the tension, Wagner decided she should meet with Jaffe to tell him her side of the story. The next day, December 12th, Wagner called Jaffe and asked to meet with him. They met for approximately 40 minutes, during which Jaffe said Wagner was "visibly upset" by the situation. She recounted her version of the events to Jaffe, who again recorded them in a memo. Wagner told him about her e-mail log and said that she had no plans to sue the SunTimes. Wagner told Jaffe: "I don't think he's making sexual advances toward me." Jaffe told Wagner he believed that, after his meeting with Greenslade, Greenslade would stop approaching her on personal matters. Wagner told Jaffe she wanted to give Greenslade "one more chance to see if he actually understood what he had done wrong . . ." and why he was making her feel uncomfortable. Jaffe and Wagner agreed to take no action at that time.

After his meeting with Wagner, Jaffe updated his supervisor, Mark Nadler, about the situation and his meetings with Greenslade and Wagner. A coworker, Celeste Williams, also met with Jaffe to tell him she felt Greenslade was bothering Wagner with the e-mails and ride offers. Williams told Jaffe that Greenslade had made a comment to Wagner

that she looked good in a particular sweater. Greenslade denies making such a comment.

That night of December 12, 1994, Greenslade suggested to another coworker, Stu Courtney, that Greenslade might send Wagner an e-mail to see if she wanted a ride home. By return e-mail Courtney advised Greenslade not to send the message. But Courtney's message reached Greenslade too late-Greenslade had already e-mailed Wagner offering her a ride home. She responded that she would take a cab. When Jaffe found out Greenslade had again e-mailed Wagner offering a ride, he was surprised considering their conversations the previous day. Jaffe again contacted Nadler and updated him. Nadler told Jaffe to arrange a meeting between them and Greenslade.

Before their meeting with Greenslade, Jaffe and Nadler met and discussed the possibility of separating Greenslade and Wagner. Nadler also contacted Chicago Newspapers Guild (also referred to herein as "the union" or "union")[3] unit chairman Charles "Nick" Nicodemus to inform him that he and Jaffe were planning to meet with Greenslade concerning the situation with Wagner, that Greenslade would be interviewed under the SunTimes' sexual harassment guidelines, and to ensure that Guild representation would be available for Greenslade if he wished. Nicodemus assured Nadler that Guild representation would be available for Greenslade should he desire it.

Greenslade next worked on December 15, 1994. Jaffe called Greenslade into his office and told him that they needed to meet with Nadler about the Wagner situation. Jaffe asked Greenslade if he wanted a Guild representative there. Greenslade responded by asking if he was being fired. Jaffe said no. Greenslade then declined any Guild representation. Greenslade told Jaffe that he would just walk out if he decided he needed a representative during the meeting.

Nadler, Jaffe, and Greenslade discussed the situation for approximately an hour. Greenslade asserts Nadler said to him early in this meeting that "this appears to be a clear-cut case of sexual harassment" and that "he [Greenslade] was not the victim." Greenslade recounted how Wagner's conduct upset him, and denied commenting to Wagner that she looked good in a sweater. Later in the conversation, Greenslade raised the option of him transferring out of the sports department to resolve the situation with Wagner.

Nadler was surprised that Greenslade was so upset and bothered by the incidents he related to them. Nadler said he was concerned about the possibility of the situation evolving into a sexual harassment case against the company. But after listening to Greenslade, Nadler "didn't see anything there that constituted sexual harassment ... under the company policy." He concluded that Greenslade "couldn't seem to leave another employee alone" and that it was "creating a work situation that was terribly uncomfortable for the other employee" and "becoming a matter of great concern in the department" because a number of employees had circulated e-mail messages concerning the situation. Nadler concluded that the newspaper could not allow the situation to remain as it was.

During the next year, 1995, the Sun–Times was scheduled to replace the manual method of layout for the sports pages with an automated process on video screens called "pagination." Greenslade would be transferred to pagination in 1995 because his previous position would no longer exist. Nadler decided to defuse the Greenslade–Wagner situation by transferring one of them. He determined that because Wagner was the newest person on the sports desk, and had worked at the paper only a few months, she did not have the experience to paginate, while Greenslade with his 14 years at the Sun–Times did. Accordingly, it was decided to transfer Greenslade.

Nadler told Greenslade that in his opinion Greenslade had exercised poor judgment in failing to read Wagner's signals that she wanted to be left alone. Nadler told Green-

---

**3.** The Guild negotiates the exclusive employment contract between the Sun–Times and its editorial department employees.

slade that the sports section was transferring over to pagination next year, and that because Greenslade would be sent there anyway, he would be transferred to the copy desk in the interim, and then when a spot opened in pagination, he would be transferred there. During the course of this meeting, Nadler and Jaffe did not discuss transferring Wagner.

Greenslade was transferred that day from his position at the sports desk to a copy editor position on the copy desk in the news department. He moved to pagination in May 1995. He has remained as a paginator since. A male employee named Bob Mutter was transferred into the sports department to fill Greenslade's former slot. Greenslade asserts that within two weeks after his transfer, due to a shortage of layout people, Wagner began doing some sports layout work, his former job responsibility. The remainder of this layout work was done by male employees. Greenslade did not suffer a pay cut because of the transfer, although he estimates that he lost in excess of $4,000 in overtime pay. Greenslade never received any written disciplinary warning or write-up because of these events. His personnel file indicates only that he was transferred. At first, Greenslade wanted to transfer back to the sports section, but later decided he wished to stay in pagination.

The Sun–Times and the Guild assert that nobody from their organizations ever told Greenslade that he had been guilty of sexual harassment or had been transferred because of sexual harassment. Jaffe said he never heard anyone characterize what had occurred between Greenslade and Wagner as sexual harassment. Greenslade admits that he was not told that he was being transferred due to any sexual harassment of Wagner. Greenslade asserts that Nadler's statement to Nicodemus that Greenslade would be interviewed under the Sun–Times' sexual harassment guidelines, along with Nadler's statement to Greenslade at the beginning of their meeting that "this appeared to be a clear-cut case of sexual harassment" and that Greenslade "was not the victim," combined with Nadler's announcement of Greenslade's transfer out of sports, created the impression

with Greenslade that the Sun–Times viewed him as a sexual harasser.

On December 19, 1994, Nicodemus met with Greenslade to discuss his job transfer and to arrange for a more thorough investigatory meeting. Greenslade gave Nicodemus his synopsis of the events. Nicodemus told the Guild's executive director that while Greenslade might have a procedural claim against the newspaper, Nicodemus could understand why the Sun–Times perceived that Greenslade had been making this uncomfortable for Wagner. On January 6, 1995, the Guild leadership met with Sun–Times management to discuss the Greenslade–Wagner situation and whether the Guild would pursue Greenslade's grievance against the paper. At this meeting, the newspaper's management showed the Guild leadership Greenslade's e-mails to Wagner. Nicodemus also interviewed Wagner and Mazzoni to get their versions of certain events. The Guild leaders met with Greenslade, his wife, and his attorney to discuss the case numerous times in January and February 1995, and Greenslade drafted numerous documents expressing his side of the story to the Guild.

The Guild also had Suzy Schultz investigate the events between Greenslade and Wagner. Schultz spoke with Wagner and Greenslade several times during the investigation, as well as with Stu Courtney and union sports steward Bob Richards. Schultz recommended that the Guild not pursue Greenslade's grievance. She based this opinion "through much pain and agony and a lot of discussion" on several factors: that the transfer was the best way to alleviate a difficult and escalating situation, that Greenslade had acted inappropriately towards Wagner, and on advice from the Guild's executive director.

The Guild leaders came to a consensus not to pursue a grievance against the Sun–Times. A majority of the Guild's leaders did not think Greenslade could win an arbitration. After informing Greenslade of this decision, the Guild leaders met with him and his attorney twice more to discuss the possibility of conditionally reopening a procedural grievance. Ultimately, the Guild decided not to

pursue even a procedural grievance on behalf of Greenslade. Nicodemus testified that Greenslade's sex was never discussed as a basis for the Guild's decision during any of its deliberations. Other Guild leaders stated that pursuing Greenslade's grievance could be contrary to Wagner's rights, and discussed how pursuing a grievance would affect female Guild members. The EEOC denied Greenslade's sex discrimination claim in less than 2 months.

## B. Procedural Background

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex[.]" 42 U.S.C. § 2000e–2(a)(1). Greenslade sued the Sun–Times and his newspaper guild for sex discrimination in violation of Title VII; he characterizes his claim as one of "reverse discrimination." He also sued the Sun–Times for alleged breach of its employment contract with him for allegedly failing to conduct a good-faith investigation of his conduct before transferring him.[4] The parties consented to resolution of this case by the magistrate judge, who considered full briefing and oral argument on the defendants' summary judgment motions.

The magistrate judge rejected Greenslade's sex discrimination claims. He found that "the Sun–Times' decision to separate Greenslade and Wagner because of the discomfort they were each feeling while working in close proximity with one another was totally proper." The magistrate judge concluded that Greenslade had not raised a prima facie case of sex discrimination because he had suffered no adverse employment action from his transfer, other than a temporary loss of overtime pay, and because he had been replaced by another man.

Even if Greenslade had raised a prima facie case, the magistrate judge found that

Greenslade was not able to demonstrate that the Sun–Times' articulated reason for the transfer—"to alleviate the situation brought on by Greenslade's unwanted advances to Wagner"—was pretextual rather than legitimate and nondiscriminatory. Greenslade "presented no evidence that female employees who engaged in similar conduct were or would have been treated any different." The magistrate judge also found no evidence that the Guild violated its duty to process Greenslade's grievance against the newspaper, and dismissed Greenslade's breach of contract claim.

## II.

Greenslade argues "that the Sun–Times ... transferred [him] in order to keep Wagner on the sports copy desk because she was the only female working there." Greenslade also asserts "that the Guild refused to grieve [his] transfer because it preferred Wagner's interests over [his] due to their respective genders." He submits that a reasonable jury could return a verdict that the Sun–Times and the Guild engaged in unlawful sex-based discrimination against him, as well as that they breached the collective bargaining agreement.

■■■ An employment discrimination case such as this involves familiar methods of proof:

There are two ways in which a plaintiff can avert summary judgment for the defendant in an employment discrimination case. The first, which is thoroughly conventional, is by putting in enough evidence, whether direct or, more commonly circumstantial, to create a triable issue of whether the adverse employment action of which he complains had a discriminatory motivation—whether he was fired, or denied a promotion, or not hired, or paid less, because of the ... protected group to which he belongs. The second way of averting

---

4. Greenslade voluntarily dismissed Count II of his complaint which alleged age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. The district court had jurisdiction over Greenslade's Title VII claims pursuant to 28 U.S.C. sec.sec. 1331 and 1343(4), and over his contract claim pursuant to the Labor Management Relations Act, 29 U.S.C. § 185(a), as well as 28 U.S.C. § 1331. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

summary judgment in an employment discrimination suit, the *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)] way, is by presenting evidence that he was qualified for the job in question and that he lost it to, or was otherwise treated less favorably than, a member of another ... sex ... and that the employer's stated reason for the adverse action is unworthy of belief, a mere pretext. If the employer presents no evidence that the plaintiff was not qualified or not treated less favorably, and offers no reason for the action taken against the plaintiff, then the plaintiff is entitled to judgment on the spot and so doesn't have to hazard a trial.

*Wallace,* 103 F.3d at 1397 (citations omitted). Greenslade did not present direct evidence of sex discrimination—evidence which "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption," *Randle v. LaSalle Telecommunications,* 876 F.2d 563, 569 (7th Cir.1989). Accordingly, he must travel the second of these two evidentiary paths, relying on indirect evidence.

### A. Sex Discrimination Claim Against Sun–Times

■ Greenslade claims that the Sun–Times discriminated against him because of his sex when it transferred him off the sports copy desk instead of Laura Wagner. To prove this claim, first he must establish a prima facie case of sex discrimination by a preponderance of the evidence. *Pasqua v. Metropolitan Life Ins. Co.,* 101 F.3d 514, 516 (7th Cir.1996). Without a prima facie case, Greenslade's claim cannot withstand summary judgment. *Id.* at 517. To raise a prima facie case of sex discrimination under the *McDonnell Douglas* burden-shifting method, Greenslade must show that (1) he belongs to a protected class (in this case, males); (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) the Sun–Times treated a similarly-situated female employee more favorably. *See McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. at 1824–25; *Cheek v. Peabody Coal Co.,* 97 F.3d 200, 203 (7th Cir. 1996).

■ The magistrate judge found that Greenslade could not meet the third and fourth of these elements. He reasoned that Greenslade did not suffer an adverse employment action because his transfer to pagination was indisputably inevitable, Greenslade admitted that he first raised the idea of a transfer with Nadler and Jaffe, and Greenslade admitted the pagination position satisfied him and he did not want to return to the sports copy desk. The fourth element was not met, the magistrate judge concluded, because Greenslade presented no evidence that any female ever conducted herself in the manner Greenslade admitted he had, and thus Greenslade could not show that the Sun–Times treated such a similarly situated female employee more favorably than Greenslade despite her conduct. Greenslade disputes these conclusions. It is unnecessary to decide whether Greenslade suffered an adverse employment action satisfying the third element of a prima facie case, however, because the record shows no evidence from which a reasonable jury could conclude that the fourth element was met—that the Sun–Times treated a similarly-situated female employee more favorably than Greenslade.

Greenslade argues that he was treated lessfavorably than Wagner. Although Bob Mutter, a male, replaced Greenslade in the sports department, Greenslade advances that this was in name only; that in fact Mutter was unqualified to do layout work, and that Greenslade's sports page layout duties were assumed, at least in part, by Wagner. Greenslade therefore concludes that not only was he effectively replaced by a female, but that he was replaced by the same female whose discomfort arguably brought about his transfer. This, Greenslade asserts, supports the conclusion that Nadler and Jaffe engineered his transfer out of the sports department to give Wagner an opportunity to do his job. Greenslade locates the Sun–Times' decision to transfer him and not Wagner in Jaffe's testimony, especially the evidence that Nadler and Jaffe wanted to hire women to work on the sports copy desk, and that Wagner was brought on at least in part because she was a woman who would "diversify" the position.

No view of the facts in this case under the summary judgment standard could equate Greenslade's situation with Wagner's. Viewing the evidence in a light most favorable to Greenslade, Greenslade—not Wagner—could not leave his coworker alone. No woman similarly situated to Greenslade conducted herself like he did but was treated more favorably by the newspaper despite that conduct: No woman admitted "butting in" to a male employee's personal life, being "overprotective" of a male coworker, persistently offered rides, felt it necessary to draft an elaborate protocol for when and how she would ask a male employee if he wanted a ride each night, and despite rejections and direction by management to stop doing so, was unable to cease offering. Greenslade admitted he did all of these things (and more, see supra pp. 857–59) to Wagner.

Greenslade first admitted that Mutter was transferred into the sports department to fill his spot. Now he argues that Mutter could not fill the job as well as he could, and that therefore other sports employees, including Wagner, assumed some of his duties. Even if Greenslade were replaced by a less talented male than he, a male replaced him nonetheless. Moreover, the "others" who assumed the layout duties included male employees. If the SunTimes were trying to rid the sports desk of Greenslade because he was a male, it would make no sense to replace him with a male, or to assign most of his former duties to other males. Rather, the newspaper made the best of a bad situation by effecting an early transfer of an annoying employee to a position to which he was destined within a year, and perhaps avoiding worse harassing conduct.

The record shows that Greenslade, not Wagner, engaged in unwanted, questionable behavior. Greenslade, not Wagner, took the issue to Jaffe and talked about it with coworkers in the sports department. Greenslade's own e-mail messages show he knew he was making Wagner uncomfortable: "I know I'm getting to be a pain [in] the butt with these ride offers. And I apologize. But I can't help myself." "I sense I'm making you uncomfortable with my offers of a ride every night." Greenslade persisted in this conduct even after Jaffe and he agreed it should cease. In contrast, Wagner was rightfully upset by Greenslade's persistent and unwelcome ride offers, the excessive number of personalized e-mails, his strange reaction to her rejections of his ride offers and her return of a borrowed book, and his actions making her a conversation topic among sports department employees. Greenslade was unwilling to accept Wagner's desire to be left alone.

Greenslade argues that he experienced discomfort too and that this makes him and Wagner "similarly situated." The undisputed facts show that any discomfort attributable to Wagner emanated from her reaction to his unusual behavior—her attempts to show Greenslade that she did not want to ride alone with him and that she was able to take care of herself. Coworkers expressed their concerns to the newspaper's management about Greenslade's behavior towards Wagner, not vice-versa. For these reasons, Greenslade has failed to satisfy the fourth element of a prima facie case of sex discrimination.

The central question of any Title VII case is whether a company's actions were motivated by discriminatory reasons. *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67 (7th Cir.1995). If an employer articulates a legitimate, nondiscriminatory reason for its action, the plaintiff must "create an issue as to whether the employer honestly believes in the reasons it offers, not whether [the employer] made a bad decision." *Sample*, 61 F.3d at 549 (citing *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1145 (7th Cir.1994)). The magistrate judge took the next step in the indirect, burden-shifting method. He assumed Greenslade had established a prima facie case, which creates a presumption of discrimination, and, hypothetically, the burden of production shifted to the Sun–Times to produce a legitimate, nondiscriminatory reason for its action. At that stage, the reason need only be facially nondiscriminatory. *See Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir.1994).

Greenslade asserts that the record, when viewed in a light most favorable to him, reveals "substantial evidence of pretext by

the Sun–Times which raises numerous questions of fact as to both what the Sun–Times did and why." But the undisputed facts show that Greenslade caused and prolonged the situation with Wagner. He does not dispute that he was overprotective of Wagner; that he knew his actions made Wagner uncomfortable; that he was disturbed by her attempts to distance herself; and that he offered her a ride after he promised Jaffe he would not. At the December 15, 1994 meeting, Greenslade raised with Nadler the option of him transferring out of the sports department to resolve the situation with Wagner. The Sun–Times knew Greenslade would be transferred out of the sports department to pagination within the year. And Wagner, a new employee, was not qualified for the position in pagination. Given the uncomfortable situation as it stood in mid-December 1994, the undisputed facts made Greenslade, not Wagner, the logical choice for a transfer.

 Greenslade has offered explanations for his actions as "attempts at humor" and as examples of his "helpful nature." But Greenslade's subjective disagreement with the Sun–Times' reaction to the objective appearance of his actions and communications does not raise a material issue of fact for trial. *Williams v. Williams Electronics, Inc.,* 856 F.2d 920, 924 (7th Cir.1988) (more than self-interested assertions challenging superiors' business judgment required to "create a basis upon which a reasonable trier of fact could find that employer's explanation of a genuinely and honestly made performance-based decision was unworthy of credence"). As we said in the same context in a discrimination case involving Chicago's other major daily newspaper, this court "does not sit as a super-personnel department that re-examines an entity's business decisions." *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987) (citations omitted). Questioning management's judgment, as Greenslade does here, does not show pretext.

Greenslade's first pretext theory is that Nadler and Jaffe had an "overriding goal" of keeping Wagner on the sports desk. For support he points to the decision to hire a woman for Wagner's position; Jaffe telling Nadler that the Greenslade–Wagner situation was a case of "potential sexual harassment"; and the inference that because Jaffe was Nadler's source of pre-December 15, 1994 information concerning the situation, Jaffe's "gender-bias" could have tainted Nadler's decision to transfer Greenslade. Greenslade claims this shows a sex bias for Wagner such that he was transferred instead of her.

 Greenslade does not advance a valid sex discrimination claim on such facts. No doubt, the situation between Greenslade and Wagner has its roots in their different sexes. But it does not follow that a management decision concerning a harassment situation is necessarily rendered with discriminatory animus based on sex just because a male and female employee are involved. Management's concern about harassment does not make a transfer a gender-based decision. Greenslade's characterization of his claim as one of "reverse discrimination" is incorrect. Even if "affirmative action" somehow played a part in how Wagner landed her position on the sports copy desk, there is no evidence the participants' sexes had any role in why Greenslade lost his. Rather, in addition to Greenslade's causing the stress in the first place, the necessity of one party moving, Greenslade's job experience, Wagner's lack thereof, and Greenslade's impending transfer to a new position dictated the Sun–Times' eminently reasonable personnel decision.

 Greenslade's second pretext theory is that the newspaper transferred him because it concluded he had sexually harassed Wagner, even though he had not. According to Greenslade, because this conclusion was erroneous, the Sun–Times's decision to transfer him was discriminatory, and the district court's grant of summary judgment should be reversed. Greenslade's contention that he was not a sexual harasser may have relevance if he was transferred for being a sexual harasser. But he was not transferred for that reason. Greenslade must cast doubt on the newspaper's stated reason for the transfer and provide evidence of a discriminatory motive on its part. *St.*

*Mary's Honor Center v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2748–49, 125 L.Ed.2d 407 (1993). Greenslade has not offered evidence that his transfer resulted from the paper concluding he had sexually harassed Wagner. He cites to comments that the newspaper investigated the sexual harassment risk of the Greenslade–Wagner situation. But Wagner had told Jaffe that she did not think Greenslade was making sexual advances towards her. And although the company initially investigated the Greenslade–Wagner situation as one of sexual harassment, Nadler and Greenslade testified that by the end of their December 15, 1994 meeting, Nadler had determined that sexual harassment was *not* at issue, and that sexual harassment had not occurred under the newspaper's policy concerning same. Rather than sexual harassment, Greenslade was guilty of irritating and sometimes harassing conduct that upset the workplace. The Sun–Times' supervisors made a reasonable personnel decision to split up Greenslade and Wagner. The possibility that this situation could turn into a sexual harassment case does not contradict the newspaper's conclusion to transfer him.[5]

Greenslade never advanced evidence of a prima facie case of sex discrimination by the Sun–Times. Even if he had, the newspaper's reason for transferring him was legitimate and nondiscriminatory, and Greenslade has failed to show that reason was a lie. The magistrate judge properly granted the Sun–Times' summary judgment motion on Green-

slade's sex discrimination claim against the newspaper.

**B. Sex Discrimination Claim Against Guild**

Greenslade also claims that his union, the Chicago Newspapers Guild, Local No. 71, discriminated against him because of his sex when it refused to file a grievance on his behalf regarding the transfer "because it preferred Wagner's interests over Greenslade's due to their respective genders." He argues that from the beginning Nicodemus accepted as true Nadler's explanation that Greenslade was harassing Wagner and continued to accept it despite Greenslade's protestations to the contrary and the Guild's investigation. Greenslade charges the Guild with doing a "slipshod" investigation of the circumstances surrounding his transfer. He also claims that one of the principal Guild investigators, Suzy Schultz, based her recommendation that a grievance for Greenslade not be filed based on the union's fear of taking a man's side over a woman's in this type of situation.

To establish a Title VII claim against the Guild, Greenslade must show: (1) the Sun–Times violated the collective bargaining agreement between the union and the newspaper; (2) the Guild breached its own duty of fair representation by letting the breach go unrepaired; and (3) that some evidence indicates animus against males motivated the Guild. *Johnson v. Artim Transportation System, Inc.*, 826 F.2d 538, 542 (7th Cir.1987); *Bugg v. International Union*

---

5. Greenslade's principal brief at page 7 states the Sun–Times confirmed Greenslade had been transferred because he was "sexually harassing Wagner." In support of this statement, the brief cites para.para. 44–46 of Greenslade's Local Rule 12(N) statement in response to the defendants' summary judgment motions. The evidence cited in those paragraphs does not support the statement in the brief. The testimony cited for this statement—the deposition statement of a Sun–Times employee that "there was no doubt Greenslade was harassing Wagner"—does not mention a sexual component to Greenslade's harassment. Greenslade argues that because Nadler told Nicodemus that Greenslade would be interviewed under the Sun–Times' sexual harassment guidelines, as well as Nadler's statement early on in their meeting that this appeared to be a case of sexual harassment and that he was not

the victim, when combined with Nadler's transfer of Greenslade away from the sports copy desk in their meeting, "created the impression to Greenslade that he was being viewed by the SunTimes as a sexual harasser." That the Sun–Times transferred Greenslade because he *sexually* harassed Wagner does not follow, as Greenslade asserts. At most, the deposition transcript references and exhibits support the conclusion that Greenslade's harassing actions contributed to the transfer decision. None of them state that the harassment was sexual, or that a sexual harassment component entered into the newspaper's or the Guild's decisions. Greenslade's statement that the newspaper had concluded *sexual* harassment had occurred is undercut by Greenslade's own deposition testimony, in which he admitted that it was concluded at that meeting that sexual harassment had *not* taken place.

of *Allied Indus. Workers of Am.*, 674 F.2d 595, 598 n. 5 (7th Cir.1982). He must demonstrate each of these three elements by a preponderance of the evidence.

The magistrate judge granted the Guild's summary judgment motion on this claim, concluding that Greenslade had not advanced a prima facie case of sex discrimination. The Sun–Times did not violate the collective bargaining agreement in transferring Greenslade, the magistrate judge determined, because none of the bargaining agreement's provisions prevented the Sun–Times from transferring employees. He also concluded that Greenslade had failed to show that a reasonable jury could find that the Guild breached its duty to fairly represent him, as the Guild conducted months of detailed investigation, which is not arbitrary or irrational conduct and far within the range of reasonableness a union is granted on this prong of the analysis. Finally, the magistrate judge found no evidence that Greenslade's sex affected the Guild's investigation and decision, but rather that the Guild had processed Greenslade's complaint in a good faith manner.

■ On the first element, Greenslade has alleged that the Sun–Times violated § 10 of the collective bargaining agreement, a general non-discrimination clause.[6] The record considered under the preponderance of the evidence standard supports the magistrate judge's conclusion that the newspaper did not violate this provision. As concluded above, Greenslade admitted more than sufficient facts from which to conclude not only that Greenslade harassed Wagner, but that he knew he was doing so. The Guild determined that Greenslade's conduct towards Wagner motivated the Sun–Times to transfer Greenslade, and nothing more. Article XXIV, § 10 of the same agreement states: "Nothing in this Agreement shall be construed to impair the right of the Employer to judge any Employee's qualifications for any

position in any classification." Because the newspaper has the unilateral right to transfer, Greenslade has not advanced a violation of the agreement.

■ Greenslade cannot meet the other two elements for such a prima facie case, either. A union breaches its duty of fair representation when its decision not to pursue a grievance is arbitrary or based on discriminatory or bad faith motives. *Griffin v. Air Line Pilots Ass'n Int'l*, 32 F.3d 1079, 1083 (7th Cir.1994); *Trnka v. Local Union No. 688, UAW*, 30 F.3d 60, 61 (7th Cir.1994). The Guild's decision not to pursue a grievance cannot correctly be characterized as any of these. The Guild pursued an extensive investigation which found Greenslade's claims to be without merit. It determined that Greenslade's actions towards Wagner were inappropriate, that the Sun–Times did not violate the agreement when it transferred Greenslade, and that the Guild could not successfully challenge the merits of the paper's decision in an arbitration. As the magistrate judge found, the record evidences a detailed and thorough investigation without bias. As concluded above with regard to the Sun–Times, Greenslade cannot point to evidence that the Guild treated similarly situated female members differently than it treated Greenslade. Greenslade's allegation of sex bias by Suzy Schultz is not well-founded, but instead an assertion grounded in contorted deposition quotes, many of which he takes out of context. As the magistrate judge found, only after investigating and reconsidering Greenslade's complaint did the Guild decide to pursue his grievance would be "fruitless." If the Guild was successful with such a grievance, the only remedy would have been Greenslade's return to the sports copy desk, which by that time Greenslade no longer desired. The magistrate judge was correct that Greenslade has not advanced a prima facie sex discrimination claim against the Guild.

---

**6.** Article XIX, entitled "Security," § 10 of the collective bargaining agreement, states:

There shall be no dismissal of or other discrimination against any Employee because of his/her membership or activity in the Guild, nor

because of age, sex, race, creed, color, national origin or non-job related disability. Race, color, creed, sex, age, non-job related disability or national origin shall not be a consideration in any element of wages and salaries, promotions or conditions of employment.

## C. Breach of Contract Claim

██ Greenslade's final theory of recovery is common law breach of the collective bargaining agreement between the Guild and the Sun–Times. He asserts that the Sun–Times had to provide employees covered by the agreement with the substantive and procedural rights listed in it, that the newspaper failed to do so, and that the Guild violated its duty of fair representation by failing to grieve the Sun–Times' alleged contract violations.

██ The defendants' summary judgment motions on this contract claim were granted because Greenslade could not demonstrate that the Guild breached its duty of fair representation, a necessary precursor to any contract claim against the Sun–Times. "Unless the union violated its duty of fair representation, [the plaintiff] cannot litigate his claim of breach of contract, because the union's responsibilities as the exclusive representative of the members of the bargaining unit include responsibility for the decision whether to prosecute a grievance on the employee's behalf." *Conn v. GATX Terminals Corp.*, 18 F.3d 417, 419–20 (7th Cir.1994); *see also Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1179 (7th Cir.1993). As concluded above, Greenslade has not shown that the Guild's decision was arbitrary or based on discriminatory or bad faith motives.

██ The magistrate also found this claim preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) ("LMRA"). Greenslade alleges that the Sun–Times had a written policy for handling sexual harassment investigations and that the newspaper was required to deal with employees covered by a collective bargaining agreement through the procedures set forth therein. By not following those procedures, the Sun–Times is in breach of the agreement, according to Greenslade. But the only employment contract covering Sun–Times editorial employees such as Greenslade is the collective bargaining agreement with the Guild, which contains a grievance procedure to resolve any disputes under the contract. Accordingly, Greenslade's common law breach of contract claim is preempted by § 301 of the LMRA. In *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), the Supreme Court stated that when the resolution of a state law claim substantially depends "upon analysis of the terms of an agreement made between the parties in a labor contract," the claim must be dismissed as preempted by federal labor contract law. *Id.* at 220, 105 S.Ct. at 1916. Greenslade's claim directly implicates the collective bargaining agreement: the harassment policy relied upon as the source of his claim (Art. XIX, § 10, *see supra* n. 6) incorporates by reference the grievance procedure of the contract. Also, the labor contract contains a prohibition against sex discrimination. In fact, Greenslade unsuccessfully sought to have his union pursue his discrimination claim under the contractual grievance and arbitration clause. Because the underlying claim is derived from the collective bargaining agreement, and the claim under that agreement is arbitrable, Greenslade's claim is preempted. The magistrate judge correctly analyzed this claim as well.

### III.

At oral argument, Greenslade's counsel harkened back to the "good old days" when a man and a woman could interact at work without being accused of harassment. Suppose Greenslade had not recognized he was bothering Wagner (which he did), and just had trouble accepting her "cold shoulder" after she had previously accepted rides, answered e-mails, and treated him cordially. That would not mean the Sun–Times' decision to transfer him, or the Guild's decision not to pursue Greenslade's grievance of the transfer, was discrimination on account of his sex. The inferences Greenslade proffers for why the decisions he disputes were sex-based do not approach raising a genuine issue of material fact for a jury.

Greenslade has not advanced a prima facie case of sex discrimination against either the Sun–Times or the Guild. The Sun–Times' reason for transferring him was legitimate and nondiscriminatory, and Greenslade has shown no pretext in that reason. Because this and his other claims are without merit,

the magistrate judge's grant of summary judgment to the defendants is

AFFIRMED.