Robert WALLACE, II, Plaintiff–
Appellant,

v.

SMC PNEUMATICS, INC.,
Defendant–Appellee.

No. 96–1609.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 25, 1996.

Decided Jan. 10, 1997.

John H. Haskin, Denise K. LaRue (argued), Roy D. Rogers, Haskin, Lauter & Cohen, Indianapolis, IN, for plaintiff–appellant.

David C. Campbell (argued), Karl L. Mulvaney, Sharon L. Groeger, Bingham, Summers, Welsh & Spilman, Indianapolis, IN, for defendant–appellee.

Before POSNER, Chief Judge, and EASTERBROOK and ROVNER, Circuit Judges.

POSNER, Chief Judge.

The plaintiff in a Title VII case, Robert Wallace, appeals from the grant of summary judgment to the defendant, his former employer, SMC Pneumatics, Inc. (we'll call it "SMC" for short). A manufacturer of door-opening systems and other industrial equipment, SMC is the American subsidiary of a Japanese corporation, and Wallace claims to be a victim of discrimination on the basis of his being an American rather than a Japanese. See 42 U.S.C. § 2000e–2(a)(1). SMC had hired Wallace in 1988 as its Engineering Manager. Two years later, when it won a contract to manufacture door openers for the rapid transit system being built for the city of Taipei (the capital of Taiwan), Wallace was put in charge of the project and temporarily relieved of his normal duties as Engineering Manager. The project was a flop. The projected profit of 30 percent per unit turned into a six percent loss. In 1992, after consulting with several individuals—including the president of the Japanese parent and Fusao Takahashi, who was a director of SMC and Wallace's supervisor on the Taipei project—David Robinson, SMC's general manager, fired Wallace for poor management of the project and also for refusal to adhere to the company's policy that its employees travel coach class even on overseas flights; Wallace had insisted on flying business class. According to Wallace's deposition, shortly before he was fired Takahashi told him that "all Americans are stupid." Takahashi denies having said this, but in the present posture of the case we must assume that he did. Wallace claims to have reported this conversation to Robinson. He also claims to have attended meetings at which Japanese was spoken without translation. And he notes that although Takahashi did not have direct authority over personnel decisions, he reported to the president of the Japanese parent rather than to Robinson and may have been conveying orders to Robinson to fire Wallace when he told Wallace that all Americans are stupid. Wallace was not replaced as manager of the Taipei project. Instead his duties were divided among six employees of SMC, of whom four are American and two Japanese. Takahashi did "replace" him as Engineering Manager, but replacement isn't really the right word, since Wallace had vacated the job for the duration of the Taipei project. The district judge granted summary judgment for the company and dismissed the suit.

Summary judgment is proper only if there is no genuine (in the sense of reasonably contestable) issue of material (that is, potentially outcome-determinative) fact. Fed. R.Civ.P. 56. Language in some of our cases implies that because intent is a critical issue in employment discrimination cases, summary judgment is unlikely to be appropriate in such cases. *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 918 (7th Cir.1996); *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038, 1042 (7th Cir.1993); *Holland v. Jefferson National Life Ins. Co.,* 883 F.2d 1307, 1312–13 (7th Cir.1989). But as there is not a separate rule of civil procedure governing summary judgment in employment discrimination cases, what the language we have referred to really means is just that courts should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be. In antitrust law, we note by way of analogy, early decisions pronouncing it a field inapt for summary judgment were later repudiated. Compare *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), with *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 595, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986). Summary judgment is hardly unknown, or for that matter rare, in employment discrimination cases, more than 90 percent of which are resolved before trial, Administrative Office of the U.S. Courts, *Judicial Business of the United States Courts: Report of the Director—1995,* p. 163, many of them on the basis of summary judgment for the defendant. See, e.g., *Visser v. Packer Engineering Associates, Inc.,* 924 F.2d 655, 659–60 (7th Cir.1991) (en banc).

The expanding federal caseload has contributed to a drift in many areas of federal litigation toward substituting summary judgment for trial. *Door Systems, Inc. v. Pro-Line Door Systems, Inc.,* 83 F.3d 169, 172 (7th Cir.1996); *Jackson v. Marion County,* 66 F.3d 151, 153 (7th Cir.1995); Samuel Issacharoff & George Loewenstein, "Second Thoughts About Summary Judgment," 100 *Yale L.J.* 73, 88–91 (1990). The drift is understandable, given caseload pressures that in combination with the Speedy Trial Act sometimes make it difficult to find time for civil trials in the busier federal districts. But it must be resisted unless and until Rule 56 is modified (so far as the Seventh Amendment permits) to bring federal practice closer to the practice in the legal systems of Continental Europe, where there is no hard and fast line between pretrial and trial and where procedure is more summary and informal than in the United States. We think that summary judgment was properly granted in this case, though our grounds differ from those given by the district judge; but we also think that the case pushes against the outer boundaries of the permissible use of summary judgment under current law.

■ There are two ways in which a plaintiff can avert summary judgment for the defendant in an employment discrimination case. The first, which is thoroughly conventional, is by putting in enough evidence, whether direct or, more commonly (see *Troupe v. May Department Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994)), circumstantial, to create a triable issue of whether the adverse employment action of which he complains had a discriminatory motivation—whether he was fired, or denied a promotion, or not hired, or paid less, because of the racial or other protected group to which he belongs. The second way of averting summary judgment in an employment discrimination suit, the *McDonnell Douglas* way (see *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973)), is by presenting evidence that the plaintiff was qualified for the job in question and that he lost it to, or was otherwise treated less favorably than, a member of another race, sex, nationality, etc.—or, in the case of age discrimination, a substantially younger worker—and that the employer's stated reason for the adverse action is unworthy of belief, a mere pretext. If the employer presents no evidence that the plaintiff was not qualified or not treated less favorably, and offers no reason for the action taken against him, the plaintiff is entitled to judgment on the spot and so doesn't have to hazard a trial. The judge treated this case exclusively as a *McDonnell Douglas* case. Yet at the outset of his opinion the judge had noted that Wallace *had* presented evidence of discrimination—Takahashi's statement that "all Americans are stupid." Wallace was not putting all his eggs in the *McDonnell Douglas* basket.

■ In rejecting Wallace's *McDonnell Douglas* argument, the judge first said that SMC had not replaced Wallace because Wallace's duties on the Taipei project had been parceled out among six employees (two of them Japanese—and we cannot think it critical that not all, or a majority, were), with each of the six picking up an average of one-sixth of Wallace's duties. An employer must not be allowed to get around Title VII, or the *McDonnell Douglas* formula, by fractionating an employee's job. *Smith v. F.W. Morse & Co.,* 76 F.3d 413, 423 (1st Cir.1996); cf. *Collier v. Budd Co.,* 66 F.3d 886, 890 (7th Cir.1995); *Shager v. Upjohn Co.,* 913 F.2d 398, 400 (7th Cir.1990). We do not consider *Lilley v. BTM Corp.,* 958 F.2d 746 (6th Cir. 1992), inconsistent with this principle, despite the statement in the opinion that "spreading the former duties of a terminated employee among the remaining employees does not constitute replacement." *Id.* at 752. That was a case in which the employer's workforce was shrinking for reasons unrelated to discrimination. The plaintiff's services were no longer required; he was not replaced. That is different from a situation in which *A* is fired, *B* and *C* are assigned each to do half the work formerly done by *A*, and *D* is hired to do the work of *B* and *C* that they must give up to do *A*'s work. That is replacement, even though *A*'s duties have been split among two (or more) employees.

■ Wallace made no effort to show that this was such a case, as distinct from a *Lilley*

case. But an employer who fires an employee because of his membership in one of the protected groups does not purchase immunity from the statute, or, again, from the *McDonnell Douglas* formula, by not replacing the employee. *Collier v. Budd Co., supra,* 66 F.3d at 890–91; *Shager v. Upjohn Co., supra,* 913 F.2d at 400; *Smith v. F.W. Morse & Co., supra,* 76 F.3d at 423; *Barnes v. GenCorp Inc.,* 896 F.2d 1457, 1465 and n. 10 (6th Cir.1990). Of course if the reason he isn't replaced is that he isn't needed, and if that rather than his race or national origin or other protected status is the reason he was fired, he has no claim. *Id.* at 1465; *Suttell v. Manufacturers Hanover Trust Co.,* 793 F.Supp. 70, 74 (S.D.N.Y.1992). But he has no claim because there is no discrimination in such a case, not because he wasn't replaced.

■ What is true is that if a plaintiff has only the *McDonnell Douglas* formula to stave off summary judgment—if he has no other evidence of discrimination—he must show that another, and similarly situated, employee, in this case an employee of a different national origin, was treated more favorably than he. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. at 1824; *Wolf v. Buss (America) Inc., supra,* 77 F.3d at 919; *Barnes v. GenCorp Inc., supra,* 896 F.2d at 1465 n. 9. That at least is the usual predicate of a *McDonnell Douglas* argument. In *O'Connor v. Consolidated Coin Caterers Corp.,* —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), an age-discrimination case, the Supreme Court held that the more favorably treated employee may himself be a member of a protected class, namely another person age 40 or older. We gave an example in *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 158 (7th Cir.1996) (per curiam), of how that principle might apply in a race case; but no argument based upon it is made here.

The qualification "similarly situated" is important. Otherwise all Wallace would have to do to survive summary judgment would be to point to one Japanese employee whom SMC had not fired. Wallace failed to show that any similarly situated Japanese employee was treated better than he. The six who picked up pieces of his job, or Takahashi who took over the job he had vacated, could not be thought similarly situated per se, that is, without evidence of similarity, of which Wallace presented none. It is not as if there had been another project, like the Taipei project, that flopped but whose manager, a Japanese, was nevertheless retained.

■ But the judge was wrong to think that evidence either of replacement or of more favorable treatment of a similarly situated employee was essential to Wallace's case. It was essential to Wallace's *McDonnell Douglas* approach but it is not an ingredient of the statute. If an American employee is mistreated because he is American, the fact that Japanese employees are also treated badly would not be a defense. The Americans might be better employees, yet, because of discrimination, treated no better. That would be actionable discrimination.

■ With the *McDonnell Douglas* route closed to Wallace, it becomes necessary to consider his evidence of discrimination; and virtually the only evidence is Takahashi's alleged comment, "all Americans are stupid." The failure to translate from Japanese into English at meetings at which Wallace was present is subject to too many alternative explanations to discrimination (such as the unavailability of a translator, or the inadvertence—which we cannot believe could be thought, without more, significant evidence of national-origin discrimination—that often results in a bilingual speaker's lapsing into his native language despite the presence of monolingual foreigners) to be considered any better than makeweight evidence of discrimination. And likewise the fact that Wallace received generally favorable employee evaluations till shortly before he was fired. Such evaluations have little significance in a case in which there is so dramatic a discrepancy between evaluation and performance (we refer to the failure of the Taipei project) as there was here. Employee evaluations, like school report cards, serve a variety of purposes, only one of which is objective evaluation. They are also morale-builders and motivators. When as is common the evaluation is by the person who hired the employee being evaluated, the evaluator may have an incentive to give the employee a high rating

in order to confirm the wisdom of the hiring decision. The practical test for summary judgment is whether if the evidence gathered in the summary judgment proceeding were presented at trial the party moving for summary judgment would be entitled to a directed verdict. E.g., *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986); *Russell v. Acme–Evans Co.,* 51 F.3d 64, 70 (7th Cir. 1995). No jury would be permitted to find discrimination on the basis of the employee evaluations and the untranslated Japanese. So we put these morsels of evidence to one side and focus on Takahashi's statement.

 If Takahashi had fired Wallace after making this statement, Wallace would have made out a prima facie case (wholly apart from *McDonnell Douglas*), that is, a strong enough case to go to a jury rather than being resolvable by the grant of a directed verdict to the defendant. We pause to note, in light of a certain confusion or ambiguity in the cases, that this is the original meaning of "prima facie case." See 9 *Wigmore on Evidence* § 2494 (James H. Chadbourn ed., rev. ed. 1981), esp. pp. 378–79 nn. 1, 3. But perhaps because *McDonnell Douglas* places a burden of production on the defendant that if not carried requires judgment for the plaintiff, the term is commonly used in discrimination cases to mean a strong enough case to compel judgment for the plaintiff unless the defendant produces evidence, e.g., *O'Connor v. Consolidated Coin Caterers Corp., supra,* — U.S. at —, 116 S.Ct. at 1309; *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509–10 and n. 3, 113 S.Ct. 2742, 2748 and n. 3, 125 L.Ed.2d 407 (1993)—strong enough that is to create a rebuttable presumption in favor of the plaintiff. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 1094 n. 7, 67 L.Ed.2d 207 (1981); *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1570 (7th Cir.1989). This is a confusing usage of "prima facie case," though by now commonplace in fields of law remote from employment discrimination. For it could be thought to mean that if the defendant fails to prove at trial that he had a nondiscriminatory reason for the action of which the plaintiff complains, the plaintiff is entitled to judgment. He is not. Once the defendant produces *some* evidence of such a reason, which need not be enough evidence to persuade the trier of fact that it is the real reason, the *McDonnell Douglas* evidence-forcing schema falls out of the case and the plaintiff must persuade the trier of fact that the true reason was a discriminatory one, just as if there had never been *McDonnell Douglas*. *St. Mary's Honor Center v. Hicks, supra,* 509 U.S. at 511–20, 113 S.Ct. at 2749–54; *Shager v. Upjohn Co., supra,* 913 F.2d at 401–02. The defendant's failure to persuade the jury that its proffered reason was its real reason permits (depending of course on the other evidence presented at the trial) an inference that the true reason which it is hiding is discriminatory, because—and it didn't require *McDonnell Douglas* to tell us this—it is circumstantial evidence of discrimination. *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1068–72 (3d Cir.1996) (en banc); *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 992–93 (5th Cir.1996) (en banc). But it does not *compel* such an inference. The true reason for the action of which the plaintiff is complaining might be something embarrassing to the employer, such as nepotism, personal friendship, the plaintiff's being a perceived threat to his superior, a mistaken evaluation, the plaintiff's being a whistleblower, the employer's antipathy to irrelevant but not statutorily protected personal characteristics, a superior officer's desire to shift blame to a hapless subordinate—conceivably a factor here—or even an invidious factor but not one outlawed by the statute under which the plaintiff is suing; or the true reason might be unknown to the employer; or there might be no reason.

It is worth emphasizing that the *only* significance of *McDonnell Douglas* is that it places a burden of production on the defendant in cases in which the plaintiff shows that he was qualified but passed over in favor of (or otherwise treated less favorably than) someone whom he contends the employer prefers on a ground forbidden by the statute under which the plaintiff is suing. If the defendant does not counter the plaintiff's evidence with regard to these two conditions *or* present evidence of a nonprohibited reason

for the alleged discrimination, then the plaintiff is entitled to judgment. If summary judgment is denied for whatever reason and the case goes to trial, the only significance of the defendant's failure to present evidence of a nonprohibited reason for the alleged discrimination is that the failure is circumstantial evidence that the reason was indeed a prohibited one, since if it was not why is the employer bashful about presenting it? *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978). There are innocent answers, as we saw earlier, but the jury is not bound (always depending on the other evidence in the case, evidence that creates the essential context in which to evaluate each piece of circumstantial evidence) to credit any of them.

What defeats Wallace's effort to build a prima facie case on Takahashi's remark is that Wallace was fired by Robinson, the general manager, rather than by Takahashi. Both Robinson and Takahashi were directors of SMC but Robinson was the general manager, the equivalent we are told of chief operating officer, and had responsibility for hiring and firing managerial employees, subject to approval from SMC's parent. Not only is there no evidence that he is prejudiced against Americans, but it is highly unlikely that he is, since he, like Wallace, is American rather than Japanese. A little common sense is not amiss in a discrimination case. (The Supreme Court in *Matsushita* deemed the fact that the plaintiffs' claim was "implausible" a basis for granting summary judgment for the defendants. *Matsushita Electric Industrial Co. v. Zenith Radio Corp., supra,* 475 U.S. at 587, 106 S.Ct. at 1356.) We doubt that *any* American thinks that "all Americans are stupid," since he would be calling himself stupid. It is true that members of minorities sometimes internalize the hostile stereotypes held by the majority; there are blacks who dislike blacks, and anti-Semitic Jews. "All Americans are stupid" is not one of the common stereotypes, and Americans are not a minority in American corporations—even, so far as appears, American corporations that are subsidiaries of Japanese firms. Takahashi, a Japanese, is far more likely than Robinson to believe that all Americans are stupid. People often denigrate foreigners; and to Takahashi, Americans are foreigners. But not to Robinson.

Robinson may have had many reasons for firing Wallace. The most likely is simply that Wallace had failed in his big mission. He may not have been at fault. But unsuccessful managers, like unsuccessful generals, are quite likely to be held strictly liable for their failures. What is least likely is that Robinson fired Wallace because Robinson had come to believe that *all* Americans, Robinson necessarily included by the most elementary principle of logic, are stupid. It would be sheer conjecture to suggest that, while not believing this, Robinson pretended to believe it in order to curry favor with his firm's Japanese parent, hoping the latter would consider Robinson's action in firing Wallace evidence that the maxim "all Americans are stupid" should be amended to "all Americans except Robinson are stupid."

■ There is only one situation in which the prejudices of an employee, normally a subordinate but here a coequal, are imputed to the employee who has formal authority over the plaintiff's job. That is where the subordinate, by concealing relevant information from the decisionmaking employee or feeding false information to him, is able to influence the decision. *Conn v. GATX Terminals Corp.,* 18 F.3d 417, 420 (7th Cir.1994); *Gusman v. Unisys Corp.,* 986 F.2d 1146, 1147 (7th Cir.1993); *Shager v. Upjohn Co., supra,* 913 F.2d at 405. In such a case, the discriminatory motive of the other employee, not the autonomous judgment of the nondiscriminating decision-maker, is the real cause of the adverse employment action. If the other employee merely utters a hostile stereotype, he is not manipulating the decision.

But maybe Takahashi was not really a coequal of Robinson—maybe he was calling the shots and Robinson was merely a cat's paw. Although Takahashi had worked for SMC since 1991, he had retained his Japanese citizenship and shortly before becoming a director of SMC had spent time in training in Japan. Robinson was unclear at his deposition to what extent Takahashi actually re-

ported to him rather than to the Japanese parent, which had retained, as we noted, the power to approve all executive hirings and firings. And Robinson acknowledged having reached a "consensus" with Takahashi and also with the president of the parent that Wallace had to go. All this adds up to very little, however. Takahashi's de facto authority was never established; it rests on surmise. And it is natural to consult with other senior executives before firing the manager of a major project. The Taipei project was SMC's bid to break out of its regular business of supplying standard components to industry. There is no basis for an inference that the consensus was a *Diktat.*

But if we are wrong and there is a jury issue whether Takahashi was responsible for forging the "consensus" that did in Wallace—whether, that is, the discriminator wielded the ax—then Wallace runs smack into Article VIII(1) of the Treaty of Friendship, Commerce and Navigation Between the United States of America and Japan, 4 U.S.T. 2063, 2070 (1953), which entitles companies of either nation to hire executive personnel of their choice in the other nation, which at the very least entitles them to discriminate in favor of their own citizens even if the other nation prohibits such discrimination. *Wickes v. Olympic Airways,* 745 F.2d 363, 367 (6th Cir.1984) (similar treaty with Greece); *MacNamara v. Korean Air Lines,* 863 F.2d 1135, 1140–41 (3d Cir.1988) (with South Korea). So SMC's Japanese parent would be free in hiring executive personnel for the parent in the United States to discriminate in favor of Japanese nationals. In *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 185–89, 102 S.Ct. 2374, 2379–81, 72 L.Ed.2d 765 (1982), the Supreme Court held that this entitlement does not extend to the U.S. subsidiary of a Japanese corporation, even if wholly owned. If, however, the parent dictates the personnel decisions of the U.S. subsidiary, those decisions are protected by the treaty. *Fortino v. Quasar Co.,* 950 F.2d 389, 393 (7th Cir.1991); *Papaila v. Uniden America Corp.,* 51 F.3d 54 (5th Cir.1995). If Takahashi was the agent of SMC's Japanese parent to control the personnel decisions of the American subsidiary, the case may come within the orbit of *Fortino.*

We can see a little bit of space between the Scylla of *Fortino* and the Charybdis of *Shager,* but not enough to sail a discrimination case through, or at least this case. Takahashi's ambiguous relation to the Japanese parent may have given him a measure of authority that undermined Robinson's ability to make an autonomous decision yet was not sufficiently direct to invoke the protection of the treaty. But discrimination cases would be fraught with uncertainty if de facto authority were allowed to trump de jure authority. In Soviet times the chauffeur at a Soviet embassy, being in fact a KGB official, might overshadow the ambassador. In family corporations, subordinates who belong to the owning family may overawe their nominal superiors who are not members of the family. If the person vested with hiring or firing authority neither harbors a discriminatory intent himself nor is being manipulated in the sense in which we have explained by a discriminating subordinate or colleague, we are reluctant to allow the latter's discriminatory motive to be imputed to the former. Certainly in large corporations it would be unlikely for de jure and de facto authority to diverge to an extent that would justify a court in seeking to go behind the organizational chart in quest of the secret lines of power. At all events, the factual basis for such a theory of liability has not been laid here. We would also have a different case if Robinson had *mistakenly* believed Takahashi authorized by the parent corporation to control hiring and firing by the U.S. subsidiary, for then the treaty would be inapplicable; but this is not argued either.

AFFIRMED.