**Michael A. DUNN, Plaintiff,**

v.

**CITY OF HIGH POINT, Defendant.**

**No. 1:98CV00360.**

United States District Court,
M.D. North Carolina.

June 8, 1999.

Amiel J. Rossabi, Robert Stuart Albright, Adams Kleemeier Hagan Hannah & Fouts, Greensboro, NC, for Michael A. Dunn, plaintiff.

Gusti W. Frankel, Womble Carlyle Sandridge & Rice, Winston–Salem, NC, for City of High Point, defendant.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

This civil rights action is before the court on Defendant City of High Point's (the "City") motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This action arises out of Plaintiff Michael A. Dunn's termination as a police officer with the City for violations of police department rules. In his complaint, Plaintiff alleges that he was terminated on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Plaintiff also asserts a state law claim for wrongful discharge in violation of the public policy set forth in North Carolina General Statute § 143.422.2 (the "EEPA").[1] The critical issue raised by this motion is whether a factual basis exists for imputing the alleged racial bias of a subordinate employee who participated in the investigation of Plaintiff's rules violations to a decision

---

1. Plaintiff also filed constitutional due process claims and a religious discrimination claim which he did not address in response to the City's motion for summary judgment. Accordingly the court finds that Plaintiff has abandoned those claim. *See* Local Rule 7.3k. In addition, at the end of discovery, Plaintiff filed a motion to amend his complaint to add claims that the City has a policy of discriminating against Plaintiff and other black officers which includes disparity in pay, failure to promote with speed and consistency, and refusal to honor an affirmative action program. By order dated March 26, 1999, Magistrate Judge Eliason denied the motion to amend. Accordingly, those claims are not part of this case and the court will not consider the parties' arguments addressing these issues.

maker with respect to whom no evidence of racial bias exists. Because the court finds no evidence that the subordinate employee improperly influenced the decision maker's determination and no evidence exists that comparably situated white officers received less severe discipline than Plaintiff, the court will grant the City's motion.

## FACTS

The following facts are established in the pleadings, affidavits, deposition testimony, and exhibits offered by the parties. Where there are disputes, each party's position is given. Dunn was hired as a police officer by the City in 1976. During his career as a police officer, Dunn earned his advanced certificate, the highest certification for police officers in North Carolina, and reached the rank of Master Police Officer III ("MPO III"). Dunn was known in the community for being tough on drug dealers and for counseling prisoners through the High Point Jail Ministry. Dunn was terminated on April 24, 1997, based on an allegation made by a former wife, Gwendolyn Tyson, that Dunn or someone acting on his behalf had forged her name on a check. Dunn disputes the allegation and contends the City does not honestly believe that he committed the offense but instead used the incident as a pretext to fire him because of his race. In particular, Dunn contends that the officer who conducted the criminal investigation into Tyson's charge, Lieutenant Danny Nunn, is racially biased and that this bias should be imputed to Chief Quijas, who ultimately determined that Dunn should be terminated for violating police department rules. To fully understand Dunn's claim, it is necessary to review his history with Tyson, the investigation conducted by the High Point Police Department in response to Tyson's complaint, and Dunn's evidence of Nunn's alleged racial bias.

### A. *Dunn's Relationship with Tyson*

Dunn and Tyson separated in 1981 and were divorced about one year later. At the time of their separation and divorce, Dunn and Tyson lived in and owned a house located at 907 Enterprise Road. After their separation in 1981, Dunn continued to live in the house until 1983, when he moved out so that Tyson could live there. Tyson and Dunn continue to be joint owners of the house.

Tyson, who did not like the fact that Dunn was a police officer and bore significant animosity toward him, made multiple threats to get him fired and made false complaints to the police department about him. Tyson also has a significant criminal history. Beginning in 1989, Tyson's criminal activity escalated from minor offenses, such as writing worthless checks, to such crimes as larceny, robbery, forgery, and drug-related offenses. Many officers within the police department, including Lieutenant Nunn, Major Rankin, Major Tysinger, Captain Fortune, and Captain Gregory, knew of Tyson's criminal history as well as her animosity toward Dunn.

### B. *Tyson's Complaint and the Ensuing Investigation*

On March 6, 1996, Tyson sent a written complaint to then-Chief Hoyng, alleging that she had received an insurance check in an amount exceeding $21,000.00 for fire damage to Dunn and Tyson's home on Enterprise Road. The check was made out to Tyson, Dunn, and Fleet Real Estate Fund ("Fleet") and was to be used to repair the house. Tyson alleged that Dunn or someone acting on his behalf forged her endorsement on the check. After receiving the letter, Chief Hoyng requested that Captain Fortune, who was responsible for conducting internal affairs investigations, look into the complaint. Fortune recalled that Dunn and Tyson had had an acrimonious relationship. Fortune spoke to Captain Gregory and Lieutenant Nunn about the relationship and both officers verified Fortune's recollection. Fortune concluded that the complaint was a domestic dispute and sent a letter to Tyson on June 12, 1996, recommending that

she seek a civil solution for her complaint. Tyson, however, sent additional complaints to Chief Hoyng and the Attorney General's Office. Based on these further complaints, Fortune and Major Hartley, Assistant Chief for the Investigations Bureau, decided that Lieutenant Nunn should conduct a criminal investigation into Tyson's complaint.

As part of his criminal investigation, Nunn interviewed Tyson, who was in prison. Fortune also attended the interview and observed Tyson's demeanor. Fortune observed that when Tyson was shown the check she was visibly shaken because she realized that her daughter with Dunn, Dewana Fant, had signed Tyson's name to the check. Tyson signed an affidavit saying that she did not endorse the check or authorize any person to sign it.

Nunn also interviewed Fant. While Fant admitted that Dunn had brought her the check, she initially denied that she had signed Tyson's name to the check. Handwriting analysis, however, confirmed that Fant wrote Tyson's name on the check and Fant later admitted that she did endorse Tyson's name. Nunn then attempted to interview Dunn, but he refused. Nunn then sought to trace the proceeds of the check. After Dunn and Fant signed the check, it went to Fleet for its endorsement, which then issued counter checks to Dunn, Tyson, and contractors and lenders to pay for repairs to the house. While Dunn was not able to produce receipts for all of the funds, receipts or other proof was provided to establish that over $18,000.00 was in fact used for repairs.

Nunn then forwarded the results of his criminal investigation to the district attorney, who concluded that "there is not sufficient evidence to sustain a conviction." (Fortune Aff. Tab 1 at 3). In Fortune's subsequent internal affairs investigation report, which included a summary of Nunn's criminal investigation, Fortune noted that the district attorney made this recommendation "because there is no proof that the proceeds *were not* spent on

the house still jointly owned by Detective Dunn and Ms. Tyson." (Fortune Aff. Tab 1 at 3 (emphasis added)).

Fortune incorporated the findings of Nunn's criminal investigation into his internal affairs investigation. In addition, Fortune also interviewed Dunn. Dunn stated that his grandson accidentally caused the fire at Dunn and Tyson's house on Enterprise Road in March 1994. At the time, Tyson was living in the house with her husband, James Tyson, and some children. The fire rendered the house uninhabitable. During this time Tyson received cost-of-living checks and repair checks from the insurer. The insurance checks were always made payable to Dunn and Tyson because they were joint owners of the house, but Dunn simply endorsed the checks at Tyson's request and allowed her to oversee repairs to the house. On occasion Tyson asked Dunn to sign contracts for repairs which he did with the understanding that Tyson was using the insurance money for repairs.

In May 1994, workers who had been hired to make repairs to the house contacted Dunn and complained that they were not getting paid. Meanwhile, in June or July 1994, Tyson "pawned" an insurance check in the amount of $21,607.46 to Rufus Bostic for $25.00. Tyson never returned for the check. After several weeks, Bostic called Dunn to let him know about the check. Dunn retrieved the check from Bostic for $25.00 and then contacted Fant because he understood that Tyson had been staying with her.

Dunn then took the check to Fant's house where it is undisputed that Fant subsequently signed the check in Dunn's presence. Dunn and Fant, however, initially gave different accounts as to the circumstances surrounding Fant's signing of the check. Dunn stated to Fortune that Fant volunteered to sign the check so that creditors could be paid. Fant initially stated that Dunn asked her to sign Tyson's name. Both Dunn and Fant indicated that

someone from the insurance company told Dunn to have Tyson's name signed on the check because it had received complaints that Tyson was not using the money appropriately. Fortune could not verify this aspect of Dunn's story, however.

Based on his review of Nunn's criminal investigation, and his own internal affairs investigation, Fortune made the following findings in his internal affairs investigation report dated April 11, 1997:

1. Check number 269502 from Bankers and Shippers Insurance Company in the amount of $21,607.46, made payable to Michael A. Dunn, Gwendolyn S. Tyson, and Fleet Real Estate Funding. The check is dated 5/19/94. The name 'Gwendolyn Tyson' was forged on the check without the knowledge or consent of Ms. Tyson.

2. The evidence proves that [Dawana] Fant signed the name of her mother Gwendolyn Tyson to the check. Ms. Fant's father, Detective Dunn, was present and aware of the circumstances when Ms. Fant forged the signature.

3. There is no indication of misuse of funds by Detective Dunn from the proceeds of the insurance settlement. The eventual proceeds of all the funds could not be traced due to lack of records and receipts. The house repair is incomplete because of the unusual relationship circumstances interfered with the work.

(Fortune Aff. Tab 1 at 5). Based on these findings, Fortune concluded that Dunn had violated the following rules of the HPPD:

Rule 4.00(a) *Standards of Conduct.* Officers and employees are to conduct their private and professional lives in a manner becoming the office they hold and which avoids tending to bring the Department into disrepute or tending to impair the operation of the Department or the efficiency of the particular officer or employee. Conduct to the contrary is conduct unbecoming an officer or employee and is grounds for disciplinary action up to and including dismissal.

Rule 4.00(h) *Knowledge of Laws and Regulations.* Each member is required to establish and maintain a working knowledge of the laws and ordinances applicable to the City of High Point, the policies and rules of the High Point Police Department, and the orders of the Department and components thereof. In the event of breach of discipline or violation of some Rule, order, procedure, or other duty, it will be presumed that the officer or employee was familiar with the law, Rule, or policy in question.

Rule 4.00(k) *Obedience to Laws and Regulations.* Members are to observe and obey all laws and ordinances and the Rules and orders of the Department.

(Fortune Aff. Tab 1 at 1, 6). Fortune's report did not include any recommendation with respect to what disciplinary action should be taken against Dunn, if any.

Fortune delivered his report to Chief Quijas, who later discussed the report with Fortune. On April 22, 1997, Chief Quijas notified Dunn that a pre-determination hearing would be held at which time Dunn would have the opportunity to respond to his alleged violations of HPPD Rules. The HPPD's Manual of Rules authorized only the Chief of Police to terminate a police officer, and it is undisputed that Chief Quijas was the sole decision maker with respect to what disciplinary action should be taken against Dunn. There is no evidence that Nunn, Fortune, or any other officer made any recommendation to Chief Quijas with respect to what discipline should be imposed against Dunn.

On April 24, 1997, Dunn's pre-determination hearing was held before Chief Quijas, Captain McGuire, and Fran Goff, a representative of the City's Human Resource Department. At the hearing, Chief Quijas explained to Dunn that the hearing was his "opportunity to share any additional information or anything that you think that I need to take into account before making my final decision regarding this incident." (Rankin Aff. Tab 4 at 2). Dunn then described in detail his difficult history

with his wife and the circumstances surrounding the signing of the check. Dunn admitted that he never asked Tyson to sign the check, but indicated that it was his understanding that Tyson had given Fant at least implied verbal permission to sign a check so that the house could be fixed. Dunn also admitted that technically what he did was "wrong," but consistently emphasized that he never misused any funds and never intended to defraud Tyson, and intended to use the funds only to get the house repaired and to get the contractors paid. (*Id.* at 15).

During the hearing, Chief Quijas did not indicate that he believed that Dunn had acted with intent to defraud or had misused the funds. Instead, Chief Quijas focused on Dunn's failure to seek out alternative methods of getting the funds released so that repairs to the house could be made. For example, Chief Quijas asked Dunn:

> Quijas: And having this history with your wife, your ex-wife having these problems and stuff, one of the things I found missing in the file was any attempt on your part to seek out other options. Did you contact a lawyer and say, hey, this is what I've got and what legally can I do to get this check voided or validated or whatever, cashed? Did you go—did you present what you're saying here to a court to get her ruled incompetent to do business where you could take over those—the check and then sign it and go ahead and pay the creditors? And I'll be honest with you, that's what I was looking for in the file. Did you do any of those things?
>
> Dunn: No, I didn't, Chief.

(Rankin Aff. Tab 4 at 11–12).

After the pre-determination hearing, Chief Quijas determined that Dunn had violated the HPPD Rules identified in Fortune's Internal Affairs investigation report and that, as a consequence, Dunn's employment should be terminated. In a letter dated April 24, 1997, Chief Quijas notified Dunn that his employment was terminated and notified Dunn of his right to appeal to the City Manager as provided in the City's personnel ordinance. Dunn then appealed to the City Manager who, upon completion of the appeal process, upheld Chief Quijas's decision.

## C. *Evidence of Nunn's Racial Bias and Evidence of Disparate Treatment*

Dunn began working under Nunn in 1988 when Nunn became the supervisor of the residential crime unit of the criminal investigations division. With brief exceptions, totaling less than two years, Nunn remained Dunn's supervisor from January 1988 through January 1997, a few months prior to Dunn's termination. Dunn was the only black detective in this division, and Dunn contends that Nunn treated him differently than white officers. While it seems clear that Dunn had difficulties working under Nunn, Dunn has conceded in many instances that white officers were subjected to similar mistreatment. For example, Nunn denied one of Dunn's training requests which Dunn claims delayed his promotion. However, it is undisputed that a white officer submitted a request for the same training which Nunn also denied. Dunn also alleges that Nunn withheld one of his training requests, but concedes that Nunn also withheld a white officer's request for the same training. Nunn also regularly criticized Dunn's report writing, even though other officers to whom Dunn showed his reports did not find problems with his writing. However, Dunn concedes that white officers also complained regularly about Nunn's criticism of their reports, and Dunn does not know how often Nunn returned reports to white officers with corrections. Nunn also called Dunn in from the field to sign a time card when that task could have waited until Dunn returned from the field. However, Dunn has not presented any evidence that Nunn did not make similar impositions on white officers.

Dunn also cites a few isolated incidents of mistreatment by Nunn which Dunn con-

tends evidence Nunn's racial bias. For example, Nunn would snap his fingers to get Dunn to come to him. Dunn also contends that Nunn would come to Dunn's office and stand over or sit silently behind him while he worked. Dunn also alleges that Nunn and other white officers also asked Dunn where he obtained the money that enabled him to live in a nice house and wear nice clothes. They then asked if he and Captain Gregory, who was also black, were selling drugs.

Dunn has not come forward with any significant examples of disparate treatment of white officers who committed offenses comparable to Dunn's. Dunn cites the example of Officer Kettner who was punished for pursuing a suspect by car onto private property. Kettner, who was white and held the same rank as Dunn, was demoted in rank from MPO III to MPO II and was suspended for up to one month. Although not cited by Dunn, there is evidence of at least two other potentially comparable situations involving discipline of white officers. In discovery, Dunn sought identification of all officers alleged to have committed "forgery, falsification, deception, fraud, or any action involving moral turpitude." Dunn is one of three officers listed in the City's response, and the other two are both white and held the same rank (MPO III) as Dunn. Officer Dunbar allegedly kidnapped his wife and took her across state lines. While the matter was under investigation, and before the City could impose discipline, Dunbar retired on disability. Officer Kelley was investigated for felony larceny of a dog, for which he was terminated.

## DISCUSSION

Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party bears the burden of persuasion on the relevant issues. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986). The non-moving party may survive a motion for summary judgment by producing "evidence from which a jury might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the motion is supported by affidavits, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see also Cray Communications, Inc. v. Novatel Computer Sys., Inc.,* 33 F.3d 390, 393–94 (4th Cir.1994) (moving party on summary judgment motion can simply argue the absence of evidence by which the non-movant could prove her case). In considering the evidence, all reasonable inferences are to be drawn in favor of the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [fact-finder] could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or . otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's race. 42 U.S.C. § 2000e–2(a). In seeking to establish his claim under Title VII, Dunn relies upon the indirect burden-shifting analysis developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff meets the relatively easy burden of establishing a *prima facie* case, an inference of discrimination arises and the burden of production shifts to the defendant to offer a legitimate, non-discrimina-

tory reason for the allegedly discriminatory act. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. If the employer meets its burden of articulating a legitimate, non-discriminatory reason for the adverse employment action, the *McDonnell Douglas* presumption disappears. *Id.* at 255 n. 10, 101 S.Ct. 1089. Plaintiff then bears the ultimate burden of persuasion to prove that the reason articulated by the employer was a mere pretext and that race discrimination is the real reason for the adverse action. *See Gillins v. Berkeley Elec. Co-op., Inc.*, 148 F.3d 413, 417 (4th Cir.1998).[2]

In this case, the City contends that Dunn cannot establish his *prima facie* case and that, even if Dunn can establish his *prima facie* case, Dunn has failed to raise a genuine issue of fact as to whether the City's proffered reason for terminating him was a pretext for racial discrimination. The court concludes that although Dunn has established a *prima facie* case of discrimination, Dunn has failed to raise a factual issue as to whether the City's action was a pretext for racial discrimination.

■ To establish a *prima facie* case of discrimination in the context of enforcement of employee disciplinary measures, a plaintiff must show: (1) that he is a member of a class protected by Title VII; and (2) that he did not violate the rule in question, *see Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir.1980), or that he received more severe punishment than employees outside the protected class

who engaged in comparable misconduct. *See Cook v. CSX Trans. Corp.*, 988 F.2d 507, 511 (4th Cir.1993); *Moore v. City of Charlotte*, 754 F.2d 1100, 1105–06 (4th Cir. 1985).[3]

■ Here, the court finds that factual issues exist as to whether Tyson authorized Fant to sign the check or at least whether Dunn understood that Tyson had authorized the signature. Moreover, there is no evidence that Dunn acted with intent to defraud. Dunn contends that all of the approximately $21,000.00 in proceeds went to repair the house and was able to produce receipts or other proof that at least $18,000.00 went to such repairs. (*See* Fortune Aff., Tab 6 at 1–5). While Dunn was unable to produce records or receipts for approximately $3,000.00 of the proceeds, there is no evidence that he misappropriated those funds. Indeed, Fortune's internal affairs investigation report to Chief Quijas concluded that "there is no indication of misuse of funds by Detective Dunn from the proceeds of the insurance settlement." (Fortune Aff. Tab 1 at 5). Accordingly, the court finds that Dunn has established his *prima facie* case by raising a factual issue as to whether he violated the rules in question.

■ The City has responded by coming forward with a legitimate, non-discriminatory reason for terminating Dunn, *i.e.*, Chief Quijas's honest conclusion that Dunn had violated the HPPD Rules. It is well

---

**2.** The Title VII framework also applies to a claim of discrimination pursuant to 42 U.S.C. § 1981, *see Theard v. Glaxo, Inc.*, 47 F.3d 676, 680 (4th Cir.1995), as well as to a claim for wrongful discharge in violation of public policy. *See North Carolina Dep't of Correction v. Gibson*, 308 N.C. 131, 301 S.E.2d 78 (1983).

**3.** Although the Fourth Circuit has not adopted the *Green* alternative for a *prima facie* case in a published decision, it has recently recognized this alternative in an unpublished decision. *See Edwards v. Newport News Shipbuilding, Dry Dock Co.*, 166 F.3d 1208, 1998 WL 841567, *2 (4th Cir.1998) (unpublished). Applying the *Green* alternative in this case does not affect the ultimate outcome because,

for the reasons discussed below, Dunn has not come forward with evidence which would support a finding that the City's proffered reason for terminating him was a pretext for illegal discrimination. Moreover, the City has not argued that the *Green* alternative is unavailable to Dunn. The court notes that if the *Green* alternative is not available to Dunn and he is forced to proceed solely under the established *Moore* framework, he cannot establish his *prima facie* case because, as the court explains in its pretext-plus discussion, Dunn has failed to present evidence that employees outside the protected class who engaged in comparable misconduct received less severe discipline than Dunn.

established that even where a Title VII plaintiff did not in fact commit the violation with which he is charged, an employer successfully rebuts any *prima facie* case of disparate treatment by showing that the decision maker honestly believed the plaintiff committed the violation. *See Gill v. Reorganized School Dist. R–6,* 32 F.3d 376 (8th Cir.1994); *Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir.1989); *Smith v. Papp Clinic, P.A.,* 808 F.2d 1449, 1452–53 (11th Cir.1987) (if the employer fired an employee because the employer mistakenly believed the employee had engaged in misconduct the discharge is not discriminatory).

At this point, Dunn must therefore come forward with evidence that Chief Quijas did not honestly believe Dunn had violated HPPD Rules and that racial discrimination was the real reason for his termination. *See Vaughan v. MetraHealth Cos., Inc.,* 145 F.3d 197, 202 (4th Cir.1998) (adopting a pretext-plus standard under which "an employer is entitled to summary judgment unless the ... plaintiff has adduced sufficient evidence 'both that reason was false and that [racial] discrimination was the real reason'") (quoting *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 201 (4th Cir.1997)). Dunn attempts to satisfy this burden by arguing that the court should impute Nunn's alleged racial animus to Chief Quijas. Dunn also argues that he received more severe punishment than comparable white officers. The court disagrees with Dunn on both points.

■ It is undisputed that Chief Quijas was the sole decision maker with respect to Dunn's termination, and Dunn has not come forward with any evidence that Chief Quijas was motivated by racial bias. Instead, Dunn asserts that Lieutenant Nunn, the officer who conducted the criminal investigation into Dunn's conduct, was racially biased and that Chief Quijas's decision was based on Nunn's investigation.

The court recognizes that "there are situations in which the forbidden motive of a subordinate employee can be imputed to an employer because under the circumstances of the case, the employer simply acted as the 'cat's paw' of the subordinate." *Willis v. Marion County Auditor's Office,* 118 F.3d 542, 547 (7th Cir. 1997). *See, e.g., Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir.1990) (holding that if the review committee was unaware of district manager's age-based animus and acted "as the conduit of the [manager's] prejudice—his cat's paw—then innocence of the members would not spare the company from liability"). Here, however, Dunn has failed to raise a genuine factual issue as to Nunn's racial bias or as to whether he improperly influenced Chief Quijas.

First, as the court noted in the factual discussion, Dunn has not identified white officers receiving preferential treatment from Nunn and concedes that many, if not all, of the white officers under Nunn's supervision had difficulties with Nunn similar to those experienced by Dunn. For example, when asked at his deposition which officers told him that they did not feel that Nunn treated them fairly, Dunn responded, "All of them. McBride, Smith, Tate, when he was back there ... Bruce Williams ...." (Dunn Dep. at 60). All of these officers are white. In short, while Dunn may have had a personality conflict with Nunn, there is no basis on this record to infer that it was because of Dunn's race.

Even assuming that Dunn has raised a factual issue with respect to Nunn's racial bias, he has failed to come forward with any evidence which would provide a basis for imputing this bias into Chief Quijas's decision. The most common context in which a subordinate employee's bias may be imputed to the decision maker involves circumstances when "the subordinate, by concealing relevant information from the [decision maker] or feeding false information to him, is able to influence the decision." *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1400 (7th Cir.1997). While courts have not clearly defined the boundaries of this area of the law, it is clear that, when the causal relationship between the

subordinate's elicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and legally permissive basis, the bias of the subordinate is no longer relevant. *Willis*, 118 F.3d at 547; *see Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir.1996) (stating that if decision maker bases decision on his own independent investigation the causal link between the subordinate's allegedly retaliatory intent and the terminations would be broken).

For example, in *Willis* the plaintiff asserted that her supervisor was racially biased and that her termination by a higher level decision maker reflected that bias. The district court and the appellate court both rejected this argument because the record affirmatively demonstrated that the decision maker's determination was not tainted by the subordinate's alleged racial animus. First, the decision maker was presented with evidence of objective violations of county policy. Second, the plaintiff had an opportunity to fully present her side of the story to the decision maker. Finally, the evidence established that the decision maker herself conducted an independent investigation. *See Willis*, 118 F.3d at 547–48. In short, there was no evidence from which a reasonable inference could be drawn that the subordinate "was the *de facto* decision maker" and that the higher level decision maker was "duped into being the conduit for [the alleged discrimination]." *Id.*

As in *Willis*, there is no evidence that Chief Quijas was an ignorant decision maker being used by Nunn as the conduit for racial discrimination. First, and most significantly, Dunn does not challenge the substance of Nunn's criminal investigation report and has not alleged that Nunn misrepresented or concealed any fact or issue in the report. At Dunn's internal affairs review with Captain Fortune, Dunn expressed a concern about Nunn's investigation because he believed that Nunn was racially biased. (Fortune Aff. Tab 5 at 2). Then, at the end of the interview, Dunn asked whether Fortune had retraced any of Nunn's investigation. The following exchange then ensued:

> Fortune: I'll give you this. Everything you told me is verified here. This [Nunn's report] is an excellent report. Even though obviously you for some reason though you say there's something between you two, then the report he did is exactly what you told me.
>
> Dunn: Okay.
>
> Fortune: And everything all the people [Nunn] talked to, I don't need to go back and talk to them because they told me exactly what you said. If I come in here and you're telling me one thing and Mr. Bostic is telling me tell him, then we got a problem. But everything you said matches this so you got a textbook perfect investigation here.
>
> Dunn: Okay.
>
> Fortune: Nobody here could have done any better than [Nunn]. So . . . .
>
> Dunn: I trust you. And I trust what you say.

(Fortune Aff. Tab 5 at 27).

Moreover, while Dunn asserts without citation to the record that Nunn "reported to Chief Quijas that Dunn had committed a forgery and recommended dismissal" (Pl.'s Br. at 11), there is no evidence that Nunn made any comments or suggestions to Chief Quijas with respect to what discipline should be imposed against Dunn. Instead, the undisputed evidence establishes that, while Nunn gathered evidence for the criminal investigation, Fortune conducted the internal affairs investigation and prepared the report which went to Chief Quijas. Fortune's report contained findings that Dunn had violated three rules of conduct. Dunn has never alleged or presented any evidence that Fortune discriminated against him. Fortune, who was aware of Dunn's concerns about Nunn, had carefully reviewed the criminal investigation and found it fair and accurate.

Not only is there no evidence that Nunn misrepresented or concealed anything in

his report, it is undisputed that Dunn had a full opportunity to present his version of events both to Fortune and Chief Quijas. *Cf. Conn v. GATX Terminals Corp.,* 18 F.3d 417, 420 (7th Cir.1994) (finding that non-decision maker's animus did not infect the decision making process where the plaintiff was able to appear before the decision maker and present his side of the story). Moreover, it is undisputed that Chief Quijas took proactive steps to verify the findings of the internal affairs investigation by conducting the predetermination hearing with Dunn. *See Willis,* 118 F.3d at 548 (decision maker's investigation into alleged rules violations broke causal link between the plaintiff's termination and the subordinate's alleged discriminatory animus) (collecting cases). In sum, there is no evidence that Chief Quijas discriminated against Dunn or that he was an unwitting conduit for Nunn's alleged discrimination.

Turning to Dunn's alternative argument, there is no evidence that white officers who committed similar violations received less severe punishment. The court does not find Officer Kettner, who was suspended and demoted for endangering public safety in the course of duty, to be comparable to Dunn. Kettner's violation related to public safety issues, whereas Dunn's violation related to honesty and trustworthiness. Moreover, Captain Gregory, who is a friend of Dunn's and is also black, himself noted that he was struck by the "severity" of the punishment imposed by Chief Quijas for Kettner's violations. (Gregory Dep. at 158). Gregory noted that it was one of Chief Quijas's first occasions for imposing discipline and it set "a new benchmark." *(Id.* at 159).

The court finds Officer Kelley, a white officer of the same rank as Dunn who was investigated for felony larceny of a dog and was terminated, to be the most comparable to Dunn. Thus, in the instance most similar to Dunn's, the City imposed the same level of discipline on a white officer as it imposed on Dunn. Accordingly, the court finds that the City is entitled to

summary judgment on Dunn's Title VII claim. Because Dunn has failed to establish a claim under Title VII, his Section 1981 and wrongful discharge claims must also fail. *See Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 759 n. 6 (4th Cir.1998) (Section 1981); *Henson v. Liggett Group, Inc.,* 61 F.3d 270, 277 (4th Cir.1995) (wrongful discharge/EEPA claim).

## CONCLUSION

For the foregoing reasons, the court will grant Defendant City of High Point's motion for summary judgment.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### ORDER and JUDGMENT

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendant City of High Point's motion for summary judgment [Doc. # 41] is **GRANTED,** and this action be, and the same hereby is, **DISMISSED** with prejudice.