# United States Court of Appeals

## For the First Circuit

No. 02-2199

JOHN R. CARIGLIA,

Plaintiff, Appellant,

v.

HERTZ EQUIPMENT RENTAL CORPORATION and JAMES HEARD,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Lynch, Circuit Judge,
Siler, Senior Circuit Judge,[*]
and Lipez, Circuit Judge.

Herbert L. Holtz, with whom Thomas P. Smith, Caffrey & Smith, P.C., were on brief for appellant.

Barry A. Guryan, with whom Christopher Novello, Epstein Becker & Green, P.C., were on brief for appellees.

April 5, 2004

---

[*]Of the Sixth Circuit Court of Appeals, sitting by designation.

**LIPEZ, Circuit Judge**. This case requires us to explore an important question related to corporate liability in an age discrimination case: whether a corporation can be held liable for discrimination when neutral decisionmakers, free of any age-based animus, rely on information that is manipulated by another employee who harbors age-based discriminatory animus.

Here, the plaintiff, John Cariglia, brought suit against the Hertz Equipment Rental Corporation for terminating him because of his age in violation of Mass. Gen. L. ch. 151B[1] and against his supervisor, James Heard, for intentionally interfering with his advantageous relationship with Hertz. Following a bench trial, the district court entered judgment for defendants on both counts. After a careful review of the arguments and the record, we vacate and remand.

## I.

Cariglia was first hired to work for Hertz in 1980 as the Boston Branch Manager. By 1992, after three promotions, Cariglia held the position of National Equipment Sales Manager. In 1992,

---

[1]The statute provides, in pertinent part, that

> [i]t shall be an unlawful practice . . . [f]or an employer in the private sector, by himself or his agent, because of the age of any individual, . . . to discharge from employment . . . unless based upon a bona fide occupational qualification.

Mass. Gen. Laws ch. 151B §4.

however, that position was eliminated and Hertz President Daniel Kaplan asked Cariglia to return to Boston to revive that branch financially. Cariglia expressed reservations about assuming the administrative paperwork required of a branch manager, and he also was concerned that returning to a branch manager position would be "a step back" for him. Kaplan proposed to appoint Bill Simmons, a salesman at the Boston branch, to serve as Cariglia's assistant branch manager and to handle those administrative tasks. Additionally, Kaplan and Cariglia agreed that Cariglia's compensation would be no lower than it was in his position as National Equipment Sales Manager. Under these terms, Cariglia agreed to return to Boston as branch manager.

From 1992 to 1996, Cariglia significantly improved the financial condition of the Boston branch. While the branch had suffered losses for at least the three previous years, it showed pre-tax income of $581,000 in 1993 and $1.4 million in 1994. The branch's gross profits grew to $2.3 million in 1995 and was on pace for $2.6 million in 1996, the year in which Cariglia was terminated. Every year the branch exceeded its pre-tax profit goals by a considerable percentage, and the Boston branch became the most profitable in the northeast. Not surprisingly, this financial turnaround earned Cariglia commendation from Hertz, including letters of praise from Kaplan and Gerry Plescia, Hertz's vice-president of operations. Cariglia's direct supervisor during

-3-

this time was defendant James Heard, Hertz's division vice-president for the northeast region. Heard gave Cariglia above-average overall rates on three successive performance evaluations from 1993 to 1995.

At the end of 1994, which was a profitable year, Heard told Cariglia that Hertz wanted to mitigate tax liability by incurring expenses to offset some of the branch's profit. The men discussed expending between $25,000 and $30,000 to paint large lifts, called "booms," that the company eventually planned to sell. However, Cariglia testified that he told Heard that booms could not be painted immediately since they were being rented to customers, and Heard responded that he did not care when the booms were actually painted so long as the painting was expensed for the 1994 tax year. As the district court noted, Heard did not contradict this testimony. In his testimony, Heard agreed that "it is general practice to only paint rental booms before resale . . . [and] that it was within Mr. Cariglia's discretion as branch manager to keep the booms out on rent earning money and satisfying customers rather than being painted." Heard also testified that he expected the booms to be painted as they became available. Ultimately, the booms were not painted by the time Cariglia was fired in September 1996.

During Cariglia's tenure at the Boston branch, several witnesses testified that Heard denigrated Cariglia, who was born in

1934, because of his age. The district court found that "evidence shows that Heard, Cariglia's supervisor, made statements rife with discriminatory animus." The district court also found that in June 1996, Heard ordered an audit of the Boston branch "motivated not by sound business reasons, but by a desire on the part of Heard to 'get the goods' on Cariglia because Heard believed Cariglia was 'over the hill,' 'not our kind' and 'should not be here.'"

This audit, conducted by Ken Eyerman, Hertz's northeast regional controller, was atypical in four regards. First, Eyerman usually scheduled branch audits himself, and this audit of the Boston branch was the only time Heard had directed him to conduct an audit. Second, according to Eyerman, whose testimony the district court credited, Heard told him to "go up to Boston and get the goods on Mr. Cariglia so he could get him out of there." Third, while the scope of a typical audit usually covered the preceding ninety days, Eyerman went back eighteen to twenty-four months because, according to his testimony, "[a]fter completing the audit guidelines, Mr. Heard said keep digging, dig deeper. He said just keep looking. Find it. Find something. He asked me to . . . see if I could get any more information about . . . anything that was going on at the branch so that we could try to get rid of Mr. Cariglia." Fourth, Eyerman spent three weeks performing the Boston audit, in contrast to the usual three to five days.

The result of the extended audit was a "poor" rating for the Boston branch. Five items were specifically mentioned, all related to internal controls: "(1) missing control copies of billing documents; (2) improper check acceptance and credit approvals; (3) inadequate safeguarding of equipment; (4) failure to follow purchasing procedures completely; and (5) missing documents from personnel files." Eyerman testified that the audit was accurate and contained his independent conclusions. After Simmons, the assistant branch manager who was directly responsible for the branch's paperwork, wrote a response memo to Eyerman, a plan was put in place to correct these internal control issues. However, Eyerman also took the unusual step of including with the audit a note to Plescia, vice-president of operations, stating that "I think there is more going on [at] this branch than can be detected through paper trails [and] internal control weaknesses."

Around the same time, Plescia received a copy of a letter from the attorney of Boston branch employee, George Harrington. This letter alleged improper business practices at the Boston branch, including equipment rented without proper rental agreements, money offered in exchange for ignoring improper rentals, equipment leased to customers without accounts, and equipment rented to customers but returned by others.

The Harrington letter, in conjunction with the Eyerman audit results, spurred Plescia, Kaplan, and vice-president of

employee relations Don Steele to request an internal corporate security investigation. Hertz's local investigator, Graham Morgan, conducted the investigation. Morgan interviewed Harrington and four other Boston branch employees in the course of preparing his report. He was unable to substantiate Harrington's allegations, writing in his report that

> [n]one of the others interviewed has any proof that equipment is leaving the yard without rental contracts. No one interviewed was ever told to look the other way or offered money to look the other way to enable a piece of equipment to leave the yard. . . . Concerning equipment that is rented by one company and returned by another, not one of the individuals could provide a concrete example of activity in this regard. . . . None of the people interviewed could accurately provide[] any information that would substantiate suspicion that John Cariglia . . . [is] taking kickbacks.

Morgan's report did, however, identify five areas of concern that emerged as a result of the interviews: "slipshod" internal controls; "[b]ooms that were to be painted by a vendor named New England Truck were never completed after money was paid to have this work done;" Cariglia's failure to forward a low bid to rehabilitate the branch site; favoritism in assigning Saturday overtime work; and a "hostile environment created primarily by the Branch manager." Morgan's report, dated August 23, 1996, was forwarded to both Steele and Heard.

On September 4, Plescia, Kaplan, and three other members of Hertz senior management decided that Morgan and Eyerman should interview Cariglia regarding the outstanding issues and conduct a follow-up audit. Morgan asked Cariglia about each of the five areas of concern he had identified in his August 23 report. Cariglia essentially denied the substance of each item, with the exception of the painting of the booms. Morgan wrote that in response to that issue, Cariglia said that "Bob Zechello handles the scheduling of the booms to be painted. Records in his office and elsewhere are available for review in this matter." Cariglia agrees that he made these statements, but he testified that Morgan neglected to mention that Cariglia told him that the booms had not been painted. Plescia and Heard received Morgan's second report.

Eyerman's follow-up audit concentrated on the vendor files related to New England Truck, the company that had been paid to paint the booms. After reviewing the relevant paperwork, he concluded that the booms had been out on rental and not available for painting. Eyerman sent the results of the follow-up audit to Heard. There is no indication in the record that any other party received a copy of this follow-up audit.

On September 19, Plescia and Steele instructed Heard to go to the Boston branch and ask Cariglia about the booms. The next day, Heard met with Cariglia in Boston and asked him if he had forgotten to paint the booms. Cariglia told him that his "plans

were to, as they had always been, to paint [the booms] when I got ready to sell them." Heard then told Cariglia that he, Heard, needed to call his supervisors and asked if Cariglia wanted to add anything to what he had said. Cariglia declined, and Heard called Plescia and Steele. According to Plescia, Heard informed them that "the booms were not painted, and that there was no accountability for the money that was paid." Plescia, Steele, and Kaplan then decided to terminate Cariglia and directed Heard to inform Cariglia that he was to be terminated for "gross misconduct." The district found as a factual matter that Plescia, Steele, and Kaplan were free of any personal age-based animus towards Cariglia when they made this decision.

After his conversation with the three executives, Heard called Cariglia back into the office and informed him that he was fired for "gross misconduct." When Cariglia asked him what "gross misconduct" meant, Heard did not provide an answer. Heard replaced Cariglia with Benjamin Robin, who was under 40 years of age at the time and had been the manager of Hertz's Newark branch.

Cariglia subsequently filed suit against Hertz and Heard in Massachusetts Superior Court. The case was removed to federal court. Following a five-day bench trial, the district court ruled in favor of both defendants. Cariglia's appeal followed.

On appeal, Cariglia urges that the district court made three errors: finding that Heard was not a decisionmaker, declining to impose liability on Hertz for Heard's animus under Mass. Gen. L. ch. 151B, and denying his intentional interference with advantageous relations claim against Heard because his termination was not a result of Heard's actions. We review the district court's legal conclusions de novo and its factual findings for clear error. Kinan v. Cohen, 268 F.3d 27, 32 (1st Cir. 2001).

## A. Heard as a Decisionmaker

As noted, the district court found that Heard's desire to terminate Cariglia as a Hertz employee was motivated by age-based animus. In Cariglia's view, this finding alone means that Hertz itself was motivated by age-based animus because Hertz's response to an interrogatory constitutes an admission that Heard was a decisionmaker, having caused or participated in the decision to fire Cariglia. Cariglia also claims that Heard agreed with and adopted questions explicitly identifying him as a decisionmaker throughout the trial. Because neither Hertz nor Heard disputed the premise of these questions--that Heard "made, ordered, caused or participated in" the decision to fire him--Cariglia reasons that the district court was required to find that Heard was a decisionmaker.

-10-

A close reading of the interrogatory and questions posed at trial reveal that the defendants did not admit or acquiesce to statements implying that it was Heard who made the decision to terminate Cariglia. The interrogatories asked, inter alia, whether Heard "participated in" Cariglia's termination, and the defendants never denied that he did. Instead, they argued, and the district court found, that Heard fired Cariglia pursuant to the instructions of Plescia, Steele, and Kaplan. Therefore, the district court did not clearly err in finding that the ultimate decision to terminate Cariglia was made by Heard's supervisors, and not by Heard.

## B. Hertz's Liability Under Mass. Gen. L. ch. 151B Even Though Heard Was Not a Decisionmaker

Cariglia argues that even if Heard is not deemed a decisionmaker, his animus impermissibly tainted the decisionmaking process when he withheld from Plescia, Steele, and Kaplan exculpatory information regarding the circumstances surrounding the painting of the booms. Indeed, this alternative basis for liability is the critical issue in this case: whether corporate liability can attach if neutral decisionmakers, when deciding to terminate an employee, rely on information that is inaccurate, misleading, or incomplete because of another employee's discriminatory animus.

Cariglia summarized his argument to the district court as follows:

-11-

> Defendants cannot "launder" the decision to terminate Mr. Cariglia by attempting to remove Heard completely from the termination decision. . . . [Hertz] regional vice president Heard orchestrated the termination and caused it by admittedly failing to inform Gerry Plescia, his superior, that Mr. Cariglia had been instructed by Heard to pay for painting the booms upon the end of 1994, that it was customary to only paint booms upon resale, that it was within the branch manager's discretion to keep the booms out on rent rather than pulling them out of productive use for repainting. Thus, Heard presented (or intentionally let stand) a completely false and misleading impression that Cariglia had somehow engaged in financial misconduct. . . .

As a legal proposition, this argument has merit under First Circuit precedent and persuasive case law from other circuits. It is also faithful to the Massachusetts Supreme Judicial Court's instruction that the "primary purposes" of Mass. Gen. L. ch. 151B §4 "are to protect citizens of the Commonwealth from adverse employment decisions based on their age . . . and to discourage, and punish, unlawful discrimination in the work place." Knight v. Avon Products, 438 Mass. 413, 424 n.6 (2003)(citations omitted). However, as we will explain infra, the district court did not address this alternative basis for Hertz's liability. As a result, it did not make a factual finding that is critical to the applicability of this corporate liability doctrine.

Massachusetts General Law 151B "sets out four elements: membership in a protected class, harm, discriminatory animus, and

-12-

causation." Lipchitz v. Raytheon Co., 434 Mass. 493, 502 (2001).

Here, there is no question that Cariglia was a member of a

protected class because of his age, that his termination

constituted harm, and that discriminatory animus was present in the

workplace. The appropriate focus, then, is on the causation issue:

whether his termination was "because of" discrimination. As the

district court noted, when assessing whether a plaintiff has

established causation, "[f]or cases brought under Mass. Gen. Laws

ch. 151B that are based on circumstantial evidence, the [Supreme

Judicial Court] has adopted the three-stage burden shifting

framework established by the United States Supreme Court under the

anti-discrimination provisions of Title VII."[2]  The plaintiff must

---

[2]The district court analyzed this as a circumstantial evidence case, an approach that Cariglia argued in his district court pleadings and does not challenge on appeal. We do not necessarily agree with this characterization because of the substantial quantity of direct evidence regarding Heard's explicit discriminatory animus.  "Typically, direct evidence consists of statements of discriminatory intent attributable to an employer." Chief Justice for Admin. and Management of Trial Court v. Massachusetts Comm'n Against Discrimination, 439 Mass. 729, 733 (2003).  "Direct evidence in this context is evidence that 'if believed, results in an inescapable, or at least highly probable, inference that a forbidden bias was present in the workplace.'" Wynn & Wynn, P.C. v. Mass. Comm'n Against Discrimination, 431 Mass. 655, 667 (2000).
Analyzing this case under the circumstantial evidence line of cases works to Cariglia's detriment under Massachusetts law. Under the more plaintiff-friendly direct evidence framework, once the plaintiff has "demonstrated with a high degree of assurance that the employment decision of which [he] complains 'was the product of a mixture of legitimate and illegitimate motives,'" "the burden of persuasion shifts to the defendant who 'may avoid a finding of liability only by proving that it would have made the same decision' even without the illegitimate motive." Wynn & Wynn, P.C.

-13-

establish a prima facie case of age discrimination by showing that "(1) he is a member of a class protected by G.L. c. 151B; (2) he performed his job at an acceptable level; (3) he was terminated; and (4) his employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's." Blare, 419 Mass. at 441. This prima facie case creates a presumption of discrimination. Id. "In the second stage, the employer can rebut the presumption created by the prima facie case by articulating a legitimate, nondiscriminatory reason for its hiring decision." Id. We agree with the district court that the parties addressed the requirements of the first and second stages.

At the third stage, "the presumption created by the prima facie case drops from the case" and "the employee must show that the basis of the employer's decision was unlawful discrimination." Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 117 (2000). The district court found that "Cariglia's case founders" at the third stage, holding that his termination was not "because of" discrimination. The Massachusetts Supreme Judicial Court summarized in Lipchitz v. Raytheon, 434 Mass. 493 (2001), the various formulations that court has used when discussing the "because of" causation requirement in Mass. G. L. ch. 151B.

_____

v. Mass. Comm'n Against Discrimination, 431 Mass. 655, 666, 669-70 (2000)(citation omitted).

> Our decisions have described the causal
> element in various ways, which essentially
> have been the proximate or determinative cause
> standard used in negligence cases. . . . [T]he
> plaintiff must prove by a preponderance of the
> credible evidence that the defendant's
> discriminatory animus contributed
> significantly to that action, that it was a
> material and important ingredient in causing
> it to happen. That a defendant's
> discriminatory intent, motive or state of mind
> is "the determinative cause" does not imply
> the discriminatory animus was the only cause
> of that action. See Dartt v. Browning-Ferris
> Indus., Inc. (Mass.) supra at 7-9, 691 N.E.2d
> 526 ("because of" does not mean "solely
> because of").

Lipchitz, 434 Mass. at 506, n.19 (internal citation omitted).

Citing Lipchitz, the district court held that Cariglia did not establish that "discrimination was a determinative factor in his termination in the sense that but for discrimination the termination would not have occurred." Specifically, it held that "the decision to terminate Cariglia was independent of any discriminatory animus that underlay Heard's derogatory, age-based remarks" because "[t]here is no evidence in this case that any of Plescia, Steele or Kaplan was motivated by discriminatory animus. There is no evidence that Heard ever discussed or otherwise infected Plescia, Steele or Kaplan with his age-based bias against Cariglia." This focus on whether Heard's animus infected people (the decisionmakers) rather than the process (manipulating the information relied upon by the decisionmakers) was erroneous.

-15-

Although we have not been presented before with the same fact pattern we face here, we have held that "evidence of corporate state-of-mind or discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or time frame involved in the specific events that generated a claim of discriminatory treatment." Conway v. Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987)(emphasis added). See also Cummings v. Standard Register Co., 265 F.3d 56 (1st Cir. 2001)(same). Similarly, in Freeman v. Package Machinery Co., 865 F.2d 1331, 1342 (1st Cir. 1988), we rejected a defense that the decisionmaker personally lacked animus and held that "[t]he inquiry into a corporation's motives need not artificially be limited to the particular officer who carried out the action." In Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st Cir. 1990), we held that the "biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case," implying that the biases of those who do make or influence the employment decision are probative.

Other circuits have reached similar conclusions. The District of Columbia Circuit Court of Appeals ruled that "[a]n unfavorable employment decision resulting from inaccurate, discriminatorily-motivated evaluations by the employee's supervisors violates Title VII," even though the decisionmaker was completely free of animus. Stoller v. Marsh, 682 F.2d 971, 972

-16-

(D.C. Cir. 1982). "When a supervisor . . . deliberately places an inaccurate, discriminatory evaluation into an employee's file, he intends to cause harm to the employee. . . . [T]he employer--that is, the organization as a whole--cannot escape Title VII liability simply because the final decisionmaker was not personally motivated by discrimination." Id. at 977. Similarly, the Fifth Circuit has held that "the discriminatory animus of a manager can be imputed to the ultimate decisionmaker if the [manager] . . . had influence or leverage over" the decisionmaking. Laxton v. Gap Inc., 333 F.3d 572, 584 (5th Cir. 2003). See also Russell v. McKinney Hosp. Venture, 235 F.3d 219, 226 (5th Cir. 2000)("If the employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary coworkers, it is proper to impute their discriminatory attitudes to the formal decisionmaker."); Abramson v. William Paterson Coll., 260 F.3d 265, 285-86 (3d Cir. 2001)("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate.").

The Seventh Circuit has held that "[a]n employer cannot escape responsibility for wilful discrimination by multiple layers of paper review, when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of older workers." Gusman v. Unisys Corp., 986 F.2d 1146, 1147 (7th Cir. 1993). More recently, the same court held that

-17-

> [t]here is only one situation in which the prejudices of an employee . . . are imputed to the employee who has formal authority of the plaintiff's job. That is where the subordinate, by concealing relevant information from the decisionmaking employee or feeding false information to him, is able to influence the decision. In such a case, the discriminatory motive of the other employee, not the autonomous judgment of the nondiscriminating decision-maker, is the real cause of the adverse employment action.

Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1400 (7th Cir. 1997)(citations omitted). See also Kientzy v. McDonnell Douglas Corp., 990 F,2d 1051, 1057 (8th Cir. 1993); Stacks v. Southwestern Bell Yellow Pages, 27 F.3d 1316, 1323 (8th Cir. 1994).

Here, the district court found as matters of fact (1) that Heard directed illegal, age-based animus at Cariglia and wanted to "get the goods" on Cariglia to justify a termination decision; (2) that Heard at least authorized if not requested Cariglia to expense painting the booms with the understanding that they would not be painted while they were rented out to customers; and (3) that the booms issue was "at the heart of the termination" and was a "pivotal consideration" in Plescia, Steele, and Kaplan's decision to terminate Cariglia. Regarding this last finding, the district court wrote that

> [w]hat seemed most to disturb Plescia, Steele, and Kaplan, however was the fact that Cariglia had failed to get the booms painted after having paid for that work. . . . It appears that it was Cariglia's failure to paint the booms and to offer to his national bosses a satisfactory explanation for this failure that

-18-

was a straw that broke the camel's back. It is surprising that such a trivial deficiency should be at the heart of Cariglia's termination. . . . [M]y judgment that the failure to paint the booms should not have loomed so large in the decision to terminate Cariglia does not matter here. . . . For better or worse, I believe it to be the case that Cariglia's payment for the painting of the booms and his neglect to see that work done was in fact a pivotal consideration in the decision to fire him.

Also, the district court emphasized the role the boom issue played in the termination decision when it wrote that

Cariglia was not terminated immediately after these national officers received the Eyerman audit and Harrington letter; he was not terminated even after they received Morgan's report. Rather, he was terminated following Morgan's September 9 interview with Cariglia concerning the booms and following the report of Heard, who was given by Plescia and Steele the specific task of going to Boston to discuss with Cariglia the matter of painting the booms.

Despite these factual findings, the district court did not address the critical legal issue of whether corporate liability can attach when neutral decisionmakers rely on information that is manipulated by another employee who harbors illegitimate animus. The crucial factual finding necessary to complete this legal analysis is whether Heard withheld from Plescia, Steele, and Kaplan exculpatory information about Cariglia's failure to paint the booms--namely, that Heard instructed or authorized Cariglia to pay for painting the booms at the end of 1994, that Heard knew at the time that the booms were not going to be painted immediately, that

-19-

he told Cariglia that he did not care when the booms were painted, that the branches typically only painted equipment prior to resale, and that it was within a branch manager's discretion to keep the booms rented rather than taking them out of use to repaint them.

There is a strong suggestion in the district court's findings that Heard, motivated by his desire to get rid of Cariglia because of his age, did indeed withhold this information from the decisionmakers. We base this observation on the district court's findings that "Heard approved the decision to spend the money to paint the booms," and, "[a]ccording to Cariglia, Heard said that he did not care when the booms were painted, so long as the painting was expensed at that time. Heard did not contradict this testimony, but stated that he expected the booms to be painted as they became available for resale." The court also observed that "Plescia testified that he learned from his and Steele's conversation with Heard that 'the booms were not painted, and that there was no accountability for the money that was paid.'" Furthermore, Plescia admitted at trial that he was "not aware that Jim Heard told John Cariglia to spend [$]25 to 30,000 before the end of the year[.]" Since the district court opinion credited Plescia's testimony in every instance, we see no reason why this portion of his testimony would not also be credible. Finally, from our read of the trial record, Hertz never argues that Plescia,

-20-

Steele, and Kaplan actually knew the full story surrounding the booms when they decided to terminate Cariglia.

Although the district court's explicit findings approach an implicit finding that Heard never divulged to Plescia, Steele, and Kaplan all of the circumstances surrounding the booms issue, we are reluctant to rely on an implicit finding on this critical issue. Accordingly, we remand to the district court so that it can address whether Heard did indeed fail to provide Plescia, Steele, and Kaplan with the full story regarding the booms.[3] If the court so finds, then, as in Wallace, "the subordinate [Heard], by concealing relevant information from the decisionmaking employee[s Plescia, Steele, and Kaplan,] or feeding false information to [them], is able to influence the decision." Wallace, 103 F.3d at 1400. This influence makes Heard's animus "probative in an employment discrimination case . . . ." Medina-Munoz, 896 F.2d at 10. Under the relevant law, the issue of the booms as grounds for termination would be impermissibly tainted with Heard's animus.[4]

_____

[3]We leave it to the district court to decide whether it can make the necessary finding on the basis of the existing record or whether it wishes to permit the introduction of additional evidence. Also, we recognize that the district court, asked to focus on the information that Heard communicated to the decisionmakers about Cariglia's handling of the booms, may reach a conclusion contrary to the strong suggestion we see in the court's present findings. We do not preclude any such finding with our analysis here.

[4]If Cariglia had been afforded a meaningful chance to address the allegations against him regarding the boom issue--to inform the Hertz executives that Heard instructed him to expense the painting

We are aware that the district court said that it "[did] not discount that Plescia, Steele and Kaplan were also influenced in their decision to terminate Cariglia by the other deficiencies in the Boston branch found by Morgan."  This finding does not alter our conclusion that the "because of" standard articulated in Lipchitz would be met by the booms issue alone.  Cariglia need not show that his termination was "solely because of" the booms.  Dartt v. Browning-Ferris Indus., Inc., 427 Mass. 1, 7-9 (1998).  Rather, he need only show that the boom issue "contributed significantly to [his termination], that it was a material and important ingredient in causing it to happen." Lipchitz, 434 Mass. at 506 n.19.  He has done so: the district court found as a matter of fact that the boom issue was "at the heart of the termination" and was a "pivotal consideration."  If the district court finds that Heard withheld exculpatory information about the booms and thus impermissibly tainted the decisionmaking process with his animus,[5] Cariglia has

when he did, the money remained on account with the vendor, and, as was the common practice, he always intended to paint the booms just prior to their resale--we might have reached a different result in this case.  See Conn v. GATX Terminals Corp., 18 F.3d 417, 420 (7th Cir. 1994)(holding that a non-decisionmaker's animus did not infect the decisionmaking process when the plaintiff was able to appear before the decisionmaker and present his side of the story).

[5]Cariglia argued to the district court that the other four alleged reasons for his termination were infected with Heard's animus, remedied prior to the termination decision, and/or the responsibility of the assistant manager, who, instead of being reprimanded, was promoted to fill Cariglia's position. On appeal, Cariglia focused more closely on the boom issue.  Assuming Heard withheld exculpatory information about the booms, the primary

shown that "[Heard's] discriminatory animus contributed significantly to [Cariglia's termination], that it was a material and important ingredient in causing it to happen." Lipchitz, 434 Mass. at 506 n.19. Put more dispositively, Cariglia will have proved that his termination was "because of" Heard's unlawful age-based discrimination, and he would be entitled to a judgment in his favor on the ch. 151B claim.

## C. Intentional Interference With Advantageous Relations

"In an action for intentional interference with advantageous relations, an employee must prove that (1) she had an advantageous employment relationship with her employer; (2) the defendant knowingly induced the employer to break that relationship; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the employee was harmed by the defendant's actions." Weber v. Cmty. Teamwork, Inc., 434 Mass. 761, 781 (2001). When this action is brought against the plaintiff's supervisor, as it is here, the "supervisor who discharges or recommends discharge of an employee is not liable for interference with the employee's contract or business relations unless the supervisor's actions were motivated by actual malice." Galdauckas v. Interstate Hotels Corp. No. 16.,

---

reason for Cariglia's termination, there is no need to address whether Heard's animus further infected the decision making process by manipulating information regarding the four other items mentioned in the security report.

-23-

901 F.Supp. 454, 465 (D. Mass. 1995).  In this context, "actual malice" is a "spiteful, malignant purpose, unrelated to the legitimate corporate interest."  Shea v. Emmanuel College, 425 Mass. 761, 764 (1997).

Cariglia argues on appeal that the district court committed an error of law when, after finding that Heard harbored age-based animus against Cariglia and ordered the audit because of his animus-based desire to "get rid" of Cariglia, it held that Heard's actions did not interfere with Cariglia's employment relationship with Hertz.  The district court dispensed with this claim briefly: "Any harm claimed by Cariglia from conduct on the part of Heard would have to be the termination of Cariglia's employment.  But as we have discussed above, Cariglia's employment was terminated for reasons independent of any conduct of Heard."  The district court apparently applied the causation standard from Lipchitz in finding that Cariglia failed to prove that he was harmed by Heard's actions.  In light of our explanation of why the district court's concept of "independent" was too limited, as well as Lipchitz's explanation that "because of" does not mean "solely because of," the district court must also reconsider its ruling on the intentional interference claim against Heard.

**III.**

For the reasons set forth, the judgment of the district court is **VACATED**. We **REMAND** for proceedings consistent with this opinion.  The parties shall bear their own costs.

SO ORDERED.