**John R. CARIGLIA, Plaintiff,**

v.

**HERTZ EQUIPMENT RENTAL CORPORATION and James Heard, Defendants.**

**No. CIV.A.98–12516–RCL.**

United States District Court, D. Massachusetts.

Nov. 5, 2004.

Herbert L. Holtz, Herbert L. Holtz, Esq., Boston, MA, Thomas P. Smith, Caffrey & Smith, P.C., Lawrence, MA, for Plaintiff.

Karen K. Burns, Epstein, Becker & Green, PC, Barry A. Guryan, Epstein, Becker & Green, PC, Christopher Novello, Epstein, Becker & Green, PC, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO ENTER JUDGMENT CONSISTENT WITH APRIL 5, 2004 OPINION OF THE COURT OF APPEALS FOR THE FIRST CIRCUIT

LINDSAY, District Judge.

### I. Introduction

In this employment discrimination case, the plaintiff, John Cariglia, brought suit against his employer, Hertz Equipment Rental Corporation ("HERC") for terminating his employment because of an age-based animus, in violation of Mass. Gen. Laws ch. 151B § 4,[1] and against his supervisor, James Heard ("Heard"), for intentionally interfering with his advantageous relationship with Hertz. After a bench trial, I entered judgment for the defendants on both counts. The Court of Appeals for the First Circuit vacated that judgment and remanded the case for proceedings consistent with its opinion. *Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77 (1st Cir.2004). The plaintiff now moves that this court enter judgment in his favor. The defendants, in turn, oppose the plaintiff's motion and move for judgment in their favor.

### II. Procedural History

Following a five-day trial in the latter part of 2001, I issued findings of fact and rulings of law ("Trial Decision") as a foundation for my judgment for the defendants. The Trial Decision was entered as docket item 75 on August 14, 2002. I

found that Heard harbored a discriminatory animus toward the plaintiff due to the latter's age. Trial Decision at 16–17. On the other hand, I found that Heard's discriminatory animus had not infected the decision to terminate the plaintiff, and that discrimination could not be established as a determinative factor in the plaintiff's termination. Accordingly, I found that the termination decision was independent of Heard's demonstrated hostility. Trial Decision at 17.

I concluded that the "pivotal consideration" in the decision to terminate the plaintiff was his failure to paint certain equipment called "booms" and to account for his having paid for the work, but not having gotten it done in timely fashion. Trial Decision at 18. The decision to terminate the plaintiff was not made by Heard, but by Daniel Kaplan, president of HERC, Don Steele, vice-president of HERC and Gerry Plescia, another HERC vice president. *Id.* at 17. The evidence, however, was that Heard approved the painting of the booms, but he knew that they could not be painted immediately because they were then being rented to a customer. *Id.* at 6. Heard's interest was simply in getting the $25,000—$30,000 for painting work expensed in 1994, and he was not troubled by the fact that the work would be expensed before it would be done. *See id.* at 6–7. My conclusion that Heard's discriminatory animus had not infected the three persons who made the decision to terminate the plaintiff left open the question of whether Heard had infected the *process* that lead to the firing of the plaintiff.

In subsequently reversing the judgment I entered, the First Circuit held that my

---

1. The statute provides, in pertinent part, that it is unlawful "for an employer in the private sector, by himself or his agent, because of the age of any individual ... to discharge from employment such individual ... unless based upon a bona fide occupational qualification."

"focus on whether Heard's animus infected people (the decisionmakers) rather than the *process* (manipulating the information relied upon by the decisionmakers) was erroneous." *Cariglia*, 363 F.3d at 85. (emphasis added) Pointing to its holding in *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1342 (1st Cir.1988) that "the inquiry into a corporation's motives need not artificially be limited to the particular officer who carried out the action," the First Circuit stated:

> The crucial factual finding necessary to complete this legal analysis is whether Heard withheld from [his superiors] exculpatory information about Cariglia's failure to paint the booms—namely, that Heard instructed or authorized Cariglia to pay for painting the booms at the end of 1994, that Heard knew at the time that the booms were not going to be painted immediately, that he told Cariglia that he did not care when the booms were painted, that the branches typically only painted equipment prior to resale, and that it was within a branch manager's discretion to keep the booms rented rather than taking them out of use to repaint them.

*Cariglia*, 363 F.3d at 86–87.

The First Circuit remanded the case to this court for a finding as to "whether Heard did indeed fail to provide [HERC's decisionmakers] with the full story regarding the booms." *Id.* at 87.

### III. Discussion

The First Circuit held that, upon a finding that Heard withheld exculpatory information from his superiors, "Cariglia will have proved that his termination was 'because of' Heard's unlawful age-based discrimination, and he would be entitled to a judgment in his favor." *Cariglia*, 363 F.3d at 88. In light of the aforementioned conclusion, the First Circuit held that this court must also reconsider the plaintiff's

intentional interference claim against Heard. *Id.* at 89.

On this remand I will make the findings required by the First Circuit's mandate on the existing trial record.

■ On review of the record, I find that Heard did indeed fail to inform the decisionmakers, Kaplan, Plescia, and Steele of the circumstances surrounding the plaintiff's failure to paint the booms. There is no evidence suggesting that Heard ever informed Plescia and Steele that (1) he had instructed the plaintiff to find an expense item that would offset annual income in 1994; (2) he had authorized or approved the decision to paint the booms; (3) he had told the plaintiff that he did not care when the booms were actually painted; and (4) that equipment of this kind is typically painted only on resale. Indeed the evidence is to the contrary. Plescia testified, for example, that he was not aware that Heard had instructed the plaintiff to spend $25,000 to $30,000 by year-end to mitigate net income for 1994. Tr. 5–38–39. *See also* Trial Decision at 6–7. Moreover, on the day that the plaintiff was terminated, September 20, 1996, Heard, who was present in the plaintiff's office, spoke to Plescia and Steele. All he told them about the booms was that the booms were not yet painted and there was "no accountability for the money that was paid." Trial Decision at 11. Heard said nothing about his role in the decision to paint the booms and to take the expense for that work in 1994 before the work was done. The record thus compels a finding that Heard withheld from his superiors exculpatory information pertinent to the plaintiff's conduct with respect to the booms.

The First Circuit concluded that if Heard is found to have withheld the aforementioned exculpatory information from his superiors, then "the subordinate

[Heard], by concealing relevant information from the decisionmaking employee[s] or feeding false information to [them], is able to influence the decision." *Cariglia*, 363 F.3d at 87 (quoting *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir.1997)). Thus, "the issue of the booms as grounds for termination would be impermissibly tainted with Heard's animus." *Id.* And so it is based on the foregoing finding. Accordingly, I find HERC liable as to the plaintiff's claim of age discrimination.

■ Regarding the second count of the plaintiff's claim, the intentional interference claim against Heard, the First Circuit noted the standard articulated in *Weber v. Cmty. Teamwork, Inc.*, 434 Mass. 761, 781, 752 N.E.2d 700 (2001):

> In an action for intentional interference with advantageous relations, an employee must prove that (1)[he] had an advantageous employment relationship with [his] employer; (2) the defendant knowingly induced the employer to break that relationship; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the employee was harmed by the defendant's actions.

The First Circuit further noted that "when this action is brought against the plaintiff's supervisor, as it is here, the 'supervisor who discharges or recommends discharge of an employee is not liable for interference ... unless the supervisor's actions were motivated by actual malice.' " *Cariglia*, 363 F.3d at 88 (quoting *Galdauckas v. Interstate Hotels Corp. No. 16*, 901 F.Supp. 454, 465 (D.Mass.1995)). "Actual malice" is defined as a "spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Shea v. Emmanuel College*, 425 Mass. 761, 764, 682 N.E.2d 1348 (1997).

The record amply shows that the plaintiff enjoyed an advantageous employment relationship with HERC, for which he worked for more than sixteen years until his termination in 1996. T. 3:98. The finding that Heard deliberately withheld exculpatory information from HERC's decisionmakers satisfies the requirement of proof that Heard knowingly induced HERC to terminate the plaintiff. As to the third prong of the *Weber* analysis, I have found that Heard's interference was not only intentional but also motivated by invidious discriminatory intent. *See* Trial Decision at 17. The harm to the plaintiff is obvious: he was discharged. Accordingly, the plaintiff has established his intentional interference claim against Heard.

### Damages

■ I begin the discussion of damages with the plaintiff's discrimination claim. It is well established that one of the principal goals of Mass. Gen. Laws ch. 151B is to "afford victims of discrimination the legal remedy of compensatory damages." *Conway v. Electro Switch Corp.*, 402 Mass. 385, 387, 523 N.E.2d 255 (1988). The only evidence as to damages in the record is that proffered by the plaintiff. At trial, the defendants did not refute or contest the plaintiff's evidence. The plaintiff presented the following evidence.

In 1996, the plaintiff's annual salary at HERC was $63,300 and he was eligible for an annual bonus of approximately $15,000. In the five years prior to his termination, the plaintiff received annual raises of between 5.3% and 11.4%. T. 2:152–58. In 1996, he earned $64,339 in wages from HERC until his termination in September. T. 3:90. Following his termination, the plaintiff was unemployed until November of 1999, at which time he was hired as a car salesman by Jannell Motors ("Jannell") in Hanover, Massachusetts. He later worked as a car salesman for Muzi Motors

in Needham, Massachusetts. T. 3:90–93. In 1999 the plaintiff earned $3,075.91 at Jannell in wages and salary, and in 2000 he earned $23,921.46. T. 3:93. The evidence shows that through November 6, 2001, the plaintiff earned wages amounting to $19,290.16 ($17,890.16 from Jannell and $1,400 from his new employer, Muzi Motors in Needham, Massachusetts).

The plaintiff seeks for back pay, front pay, and emotional distress, with respect to his discrimination claim. Assuming annual raises of 5% in salary and bonus, he calculates that he would have received salary and bonus of about $82,215 in 1997; about $86,325 in 1998; about $90,642 in 1999; about $95,174 in 2000; about $99,932 in 2001; about $104,928 in 2002; about $110,174 in 2003; and about $115,682 in 2004. *See* Plaintiff's Motion to Enter Judgment at 11. He estimated that his total wages for 2001 would be less than $25,000, and that his annual wages at Muzi Motors would never likely exceed $30,000 per year. *See Id.* at 12. Accordingly, the plaintiff seeks $657,026.63 [2] in compensatory damages for lost wages and reduced earning capacity.

█ I find the plaintiff's calculations for lost income reasonable in all respects. However, given the plaintiff's age—70 at the time of this order, Tr.2–33—and his testimony that he only planned to work until about 2005, Tr. 3–97, and the fact that an award of lost income through 2004 is being made, no award for front pay is appropriate.

█ The plaintiff also seeks $300,000 in damages for emotional distress. He offered some evidence of physical manifestations of emotional distress following his

termination (loss of appetite and sleeplessness, Tr. 2–135). There was no evidence, however, that he consulted a professional to assist him in dealing with any physical or psychological manifestations of that distress. Indeed, he rejected his wife's suggestions that he seek professional help. Tr. 2–135. The record, however, offers other evidence from which I may infer that the plaintiff suffered emotional distress. The plaintiff testified to the humiliation and the feeling of being "lost" upon his termination. Tr. 2–131, 2–136. He testified to isolation from his family, Tr. 2–135–136, Tr. 3–133–135, and to anxiety about how he would support himself and his loved ones, (including his granddaughter of whom he and his wife have custody and who has experienced some developmental problems). Tr. 2–136. The plaintiff endured three years of joblessness, during which time he was compelled to spend considerable sums from his IRA for living expenses. *See* Tr. 3–139. I can and do infer that the necessity of resorting to retirement funds to sustain himself during the relatively lengthy period of unemployment and the uncertainty about whether the would ever work again, *see* Tr. 2–149–150, was a source of considerable emotional distress. For the foregoing reasons, then, I find that the plaintiff did suffer emotional distress as a consequence of his discriminatory termination.

There is, of course, no mathematical formula by which to measure damages for emotional distress. *See Wagenmann v. Adams,* 829 F.2d 196, 216 (1st Cir.1987). On the other, because I have found that much of the plaintiff's emotional distress was related to anxiety about how he would support his family during the uncertain

---

2. The plaintiff's figures are as follows: $13,961 for 1996; $82,215 for 1997; $86,325 for 1998; $87,556.09 for 1999; $71,253.54 for 2000; $74,932 for 2001; $74,928 for 2002; $80,174 for 2003; and $85,682 in 2004. *See* Plaintiff's Motion to Enter Judgement at 12.

years of his unemployment and the use of retirement funds for that purpose, I have determined to measure emotional distress by the amount the plaintiff used from his retirement funds to pay his living expenses. He testified that the amount was between $150,000 and $200,000. Tr. 2–150. His wife, Norma, gave testimony that was consistent. She said that the amount was between $170,00 and $180,000. Tr. 3–139. Accepting the low end of Mrs. Cariglia's testimony, I award emotional distress damages of $170,000.

■ The plaintiff also seeks punitive damages pursuant to Mass. Gen. L. ch. 151B § 7. In this case, however, the liability of HERC results from an expansion—or at least a clarification—of the concept of employer liability under chapter 151B. Moreover, the decision to terminate the plaintiff was made by persons who were not fully informed of the facts about the critical issue (the painting of the booms) that resulted in the plaintiff's discharge. Finally, the judgment in this case will be a substantial one and will include interest at the Massachusetts statutory rate of twelve percent. For all these reasons, I will not award punitive damages.

■ The plaintiff seeks attorneys fees and costs. He is entitled to recompense for reasonable expenditures of this kind, pursuant to Mass. Gen. L. ch. 151B § 9. The plaintiff's counsel may file and serve such papers as are appropriate to justify an award of attorneys' fees and costs.

■ I also find that the plaintiff has suffered economic harm as a result of Heard's intentioned interference with the plaintiff's advantageous relationship with HERC. That harm is measured by the damages set forth above with respect to the discrimination claim. Accordingly, the judgment entered in this case will be entered against the defendants jointly and severally. Any costs attributable to the plaintiff's claim against Heard will be awarded separately. The plaintiff is not entitled to an award of attorneys' fees against Heard.

### Conclusion

■ Judgment following remand shall enter in the plaintiffs' favor and jointly and severally against the defendants as follows:

| | |
|---|---|
| Lost Income | $657,026.63 |
| Emotional Distress | 170,000.00 |
| | |
| Total | $827,026.63 |

The clerk shall calculate interest on the foregoing amount at an annual rate of 12% from September 20, 1996, the date of the plaintiff's termination. Plaintiff's counsel may submit and serve a request for an award of attorneys' fees against HERC and for an award of costs against Heard and HERC as appropriate. The motion of the defendants for judgment in their favor is DENIED.

SO ORDERED.